Filed 8/29/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THOMAS NICKERSON, | B234271 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC405280) |
| v. | |
| STONEBRIDGE LIFE INSURANCE COMPANY, | |
| Defendant and Appellant. | |

APPEALS from orders and a judgment of the Superior Court of Los Angeles County, Mary Ann Murphy, Judge. Order denying motion for judgment notwithstanding the verdict is affirmed, order granting the new trial motion is vacated, and the judgment is modified and affirmed.

Shernoff Bidart Echeverria Bentley, William M. Shernoff, Howard S. Shernoff, Travis M. Corby; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Appellant.

Baute Crochetiere & Wang, David P. Crochetiere, Henry C. Wang; Reed Smith and Margaret A. Grignon for Defendant and Appellant.

Amy Bach; Knapp & Roberts and David L. Abney for United Policyholders as Amicus Curiae on behalf of Defendant and Appellant.

**INTRODUCTION**

The sole issue raised by both parties to this appeal concerns the punitive damage award, specifically, whether the trial court's remittitur of that award from $19 million to $350,000 based on a ratio of punitive to compensatory damages of 10:1 comports with due process. Thomas Nickerson sued Stonebridge Life Insurance Company (Stonebridge) challenging the insurer's partial denial of his claim for hospitalization benefits. The trial court ruled that a policy provision limiting coverage was not conspicuous, plain, and clear and was therefore unenforceable, entitling Nickerson to $31,500 in additional benefits under the policy. A jury then found that Stonebridge had breached the implied covenant of good faith and fair dealing and awarded Nickerson $35,000 in compensatory damages for emotional distress. The jury found Stonebridge acted with fraud and fixed the punitive damage award at $19 million. The trial court conditionally granted Stonebridge's new trial motion unless Nickerson consented to a reduction of the punitive damages to $350,000.[1] Both parties appeal. After weighing all of the relevant factors and circumstances pursuant to *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408 (*State Farm*) and *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159 (*Simon*), we hold the trial court's remittitur of punitive damages was proper. Accordingly, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

1.      *The insurance policy*

Stonebridge insured Nickerson under a policy (the policy) providing coverage for hospital confinement, intensive care unit confinement, and emergency room visits. Stonebridge agreed to pay indemnity in the amount of $350 per day for each day of confinement in a hospital for a covered injury, $350 per day for each day of confinement in a hospital intensive care unit, and $150 per visit to a hospital emergency room. Although payment of claims under this policy is related to healthcare services rendered to

---

[1]      For convenience, we will refer to the remitted punitive damage amount of $350,000 as the remitted punitive damage award or the punitive damage award.

the insured, the policy is not healthcare insurance that pays for medical expenses.  The insured is free to use the funds in any manner he or she wishes, i.e., for rent or a car payment.

The policy's insuring clause for the "Accidental Daily Hospital Confinement Benefit" stated:  "We will pay the Daily Hospital Confinement Benefit stated on the Schedule Page for each day of Confinement due to a covered injury, beginning with the first day of Confinement.  A Covered Person must be under the professional care of a Physician, and such Confinement must begin within 90 days of the accident causing the injury."  (Capitalization omitted.)

A definitions section contained 10 definitions, including:

"HOSPITAL CONFINEMENT/CONFINEMENT/CONFINED means being an inpatient in a Hospital for the necessary care and treatment of an Injury.  Such confinement must be prescribed by a Physician.

"Confinement does not include outpatient care and treatment, including outpatient surgery or outpatient observation received in a Hospital.

"[¶] . . . [¶]

"NECESSARY TREATMENT means medical treatment which is consistent with currently accepted medical practice.  Any confinement, operation, treatment, or service not a valid course of treatment recognized by an established medical society in the United States is not considered 'Necessary Treatment.'  No treatment or service or expense in connection therewith, which is experimental in nature, is considered 'Necessary Treatment.'

"We may use Peer Review Organizations or other professional medical opinions to determine if health care services are:

"1.  medically necessary; and

"2.  consistent with professionally recognized standards of care with respect to quality, frequency, and duration; and

"3.  provided in the most economical and medically appropriate site for treatment.

"If services do not meet these criteria, expenses related to those services will not be deemed 'Necessary Treatment.' "

The policy defined a "Hospital" as an institution that, among other things, is engaged primarily in providing "medical, diagnostic, and major surgery facilities for medical care and treatment of sick and injured persons on an inpatient basis," excluding any institution or any part of an institution operated primarily as a "convalescent home, convalescent, rest, or nursing facility."

The policy period began in October 2007, and the policy stated that coverage would continue as long as Nickerson continued to pay his monthly premium.

2.  *Nickerson's injury and hospitalization*

Nickerson served in the United States Marines and therefore is entitled to medical care at Veterans Administration (VA) hospitals at no cost. He was involved in a snowmobile accident in 1997 and became paralyzed from his chest down. He now relies on a wheelchair. Nickerson is single and has worked as a live-in caretaker for other veterans since 2000 in exchange for free rent. His only income is a very small military pension.

Nickerson was sitting in a motorized wheelchair on a lift about to be lowered from his van when he accidently struck the control, causing the wheelchair to lurch forward. He fell from the wheelchair on the lift down to the pavement. The accident occurred on February 11, 2008. He suffered a broken leg and was taken to a VA hospital in Long Beach, first to the emergency room and then to a spinal cord unit, that was equipped to treat paraplegics and quadriplegics. Nickerson's primary care physician, Dr. Hung Nguyen, treated him there together with orthopedic physicians.

Nickerson suffered a comminuted, displaced fracture of his right tibia and fibula, meaning that the leg was broken, splintered, and out of place. A full-leg splint, a so-called Long Beach splint, was put in place extending from his upper thigh to the beginning of his toes. He soon experienced complications from the injury, including heterotopic ossification (formation of bone in a joint), bruising, swelling, blistering, infection, and a risk of gangrene. He remained at risk for blood clots. Nickerson was

4

confined to a hospital bed and received intravenous fluids until around February 29, 2008, although he continued to have some blisters from an infection.

An orthopedic physician approved Nickerson's sitting in a wheelchair again on March 24, 2008. He could tolerate two hours at a time in a wheelchair by May 9, 2008, and an orthopedic physician determined that he would be ready for discharge when he could tolerate three hours at a time in a wheelchair. Dr. Nguyen decided that Nickerson was stable and ready to return home on May 19, 2008, except that he was unable to maneuver into his bathroom without a particular part needed for his wheelchair. After obtaining the needed part, Dr. Nguyen discharged Nickerson from the hospital on May 30, 2008. In all, Nickerson was hospitalized under Dr. Nguyen's care from February 11 until May 30, 2008, a total of 109 days.

3.      *Nickerson's claim and Stonebridge's handling of his claim*

Nickerson submitted a claim to Stonebridge on June 2, 2008, together with a completed form that Stonebridge had provided to authorize the release of his medical records. Stonebridge sent him a letter dated June 18, 2008, stating that the Long Beach VA hospital required him to complete and sign a different authorization form. Rather than complete the form, Nickerson went to the hospital himself, obtained copies of his records and mailed them to Stonebridge. Nonetheless, Stonebridge sent him another letter enclosing the same authorization form along with an Explanation of Benefits form stating that his file was closed until the information requested of him was received. Nickerson completed and returned the form.

Nickerson sought assistance from the California Department of Insurance on July 22, 2008. He explained that he had been in the hospital for 109 days and could not use the bathroom or enter a bedroom because of the Long Beach splint on his leg. After he had sent his medical records to Stonebridge, Nickerson was notified that his file was closed until the insurer received additional information. On August 15, Stonebridge wrote to Nickerson to advise him it was ordering records from the Long Beach VA Hospital.

Stonebridge notified Nickerson in a letter dated August 28, 2008, that it had received the information requested from the Long Beach VA Hospital, and that it was requesting additional information from a medical peer review organization. Stonebridge sent Nickerson's file to the Medical Review Institute of America and requested answers to three questions: (1) "Was the confinement medically necessary for inpatient treatment of the right tibia/fibula fracture? If so, for how many days?" (2) "Was treatment consistent with professionally recognized standards of care with respect to quality, frequency and duration?" and (3) "Was treatment provided in the most economical and medically appropriate site for treatment?" The Case Review Submittal Form included a box to check if Stonebridge required a phone consultation between the peer reviewer and the treating physician. Stonebridge did not check the box. Amy Hammer, Stonebridge's technical claims specialist, testified that neither she nor anyone at Stonebridge had ever requested a reviewer contact the treating physician.

Stonebridge received a peer review report dated September 9, 2008 that concluded, "By 2/29/08 the fracture blebs and leg swelling was improved and there were no further signs of active leg infection, compartment syndrome or thromboembolic disease. His initial splint had been changed to a more stable Long Beach splint and was able to transfer from bed to gurney. At that point it was reasonable that a transfer *to a less acute care environment such as a rehabilitation center or even back home with a care giver was possible*. Visits to the orthopaedic clinic for further follow up could have been arranged and there was no evidence of additional need *for acute hospitalization*. On going care after that date was primarily directed to care of his chronic trophic ulcerations and physical therapy. Average length of stay for proximal tibial fractures according to ODG is 4.0 days, however Milliman indicates that hospitalization for complications for paraplegic treatment as in this case can result in extended stays. That extension based on the clinical situation as described in the progress notes should have been until Feb. 29. [¶] . . . [¶] After, Feb. 29, [*sic*] *a more economical and medically appropriate facility could have been chosen*." (Italics added.)

6

Stonebridge notified Nickerson in a letter dated September 10, 2008, that it had completed the processing of his claim for benefits. The letter stated that an independent medical reviewer had determined that acute care hospitalization was medically necessary only from February 11 until February 29, 2008, and that his treatment after February 29 could have been done in a less acute care environment or at home with a caregiver. It stated that his hospitalization therefore was "Necessary Treatment," as defined in the policy, only from February 11 until February 29, 2008, and that he was entitled to benefits only for that period. Stonebridge sent Nickerson a check for $6,450 shortly thereafter.

Nickerson turned to Dr. Nguyen for help by asking him to write a letter to Stonebridge explaining his extended hospitalization. Dr. Nguyen's three-paragraph letter dated September 30, 2008, stated, in relevant part: "The fracture was complicated by extensive swelling, infection, blistering, and muscle damage *that required acute hospitalization*, intravenous fluids and antibiotics, and full staff support including consultation with an orthopedic surgeon. The infection and blistering subsided as Mr. Nickerson completed his antibiotics on March 1, 2008. During this time, the right leg was placed in a Long Beach Splint, kept elevated and fully extended.

"Mr. Nickerson was living alone and *could not have been discharged safely at that time*. The orthopedic consultants recommended that he remain supine in bed or gurney and did not clear him for wheelchair use until March 24, 2008. He did not have an available caregiver that could provide bedside care at home during this period. *They also recommended that his fractured leg be kept fully extended in the splint (no flexion permitted) to allow healing. They did not lift this restriction until May 5, 2008.* His home has narrow doorways and corners he could not have managed in his wheelchair if his leg was fully extended." (Italics added.)

Stonebridge responded to Nickerson in a letter dated October 10, 2008, stating that Dr. Nguyen's letter did not change its decision because Dr. Nguyen did not indicate that hospitalization in an "<u>acute</u> care setting" was required as of March 1, 2008. Continuing, the October 10 letter stated in relevant part: "Although you may have needed to be

confined on an inpatient basis, *there is no indication that you had any medical conditions [o]n March 1, 2008 or after that required inpatient <u>acute</u> care*. Therefore, your confinement in an <u>acute</u> care setting as of March 1, 2008 was *not provided in the most economical and medically appropriate site for treatment* and was not consistent with professionally recognized standards of care." (Italics added.) Hammer conceded there is no requirement in Nickerson's policy that the care be acute to be covered.

Hammer did not know at the time she received the reviewer's report that care at VA hospitals was free for veterans like Nickerson. She acknowledged that she did not believe that the Long Beach VA Hospital kept patients hospitalized unnecessarily. Hammer conceded that Nickerson's claim fell within the policy's grant of coverage and not within any of the policy's stated exceptions. She also conceded that the Long Beach VA Hospital was the most economical site for Nickerson's treatment. Hammer testified she would handle Nickerson's claim the same way today. This was confirmed by Stonebridge's vice president of claims at the time.

### 4. *Trial court proceedings*

Nickerson's lawsuit against Stonebridge ensued. His complaint alleged Stonebridge breached the insurance contract by failing to pay him benefits for the full 109 days of his hospital stay and that Stonebridge breached the implied covenant of good faith and fair dealing by acting unreasonably and in bad faith in denying him the full policy benefits.

At the close of Nickerson's case, the trial court granted his motion for a directed verdict on the cause of action for breach of contract, finding as a matter of law that the "Necessary Treatment" limitation was a limitation of coverage that was not conspicuous, plain and clear in the policy and therefore was unenforceable. The court found that Nickerson was entitled to $31,500 in unpaid benefits for the breach of contract cause of action.

The jury returned a special verdict finding that Stonebridge's failure to pay policy benefits was unreasonable or without proper cause and that Nickerson suffered $35,000

in damages for emotional distress as a result. The jury also found Stonebridge had "enagage[d] in the conduct with fraud."

In the punitive damages phase of trial, the court instructed the jury that Stonebridge failed to comply with two orders to produce documents. This instruction was the result of Stonebridge's defiance of two court orders to produce its so-called "Blue Forms," the internal forms Stonebridge used when denying claims so as to comply with the California Fair Claims Practices Act. Nickerson introduced two exhibits showing Stonebridge had a net worth in excess of $368 million, and a binder of evidence (Exhibit 33) showing other claims that Stonebridge had denied based on the "Necessary Treatment" or "Necessary Emergency Treatment" definition in its policies. The jury awarded Nickerson $19 million in punitive damages, equaling approximately 5 percent of the company's net worth.

The parties had stipulated before trial that the trial court could determine the so-called *Brandt* fees, the amount of attorney fees to which Nickerson was entitled under *Brandt v. Superior Court* (1985) 37 Cal.3d 813, 817 (when the defendant insurer's tortious conduct forces insured to retain counsel to obtain the policy benefits, the insurer is liable for attorney's fees), if Nickerson succeeded on his complaint. After trial, the parties stipulated to $12,500 in attorney fees, and the court awarded that amount.

Stonebridge moved for judgment notwithstanding the verdict (JNOV) seeking a reduction in the punitive damage award from $19 million to $35,000. The insurer argued that the punitive damage award was unconstitutionally excessive and that it should not exceed the amount of tort damages awarded. Stonebridge also moved for a new trial seeking a reduction in the punitive damage award "to a minimal amount." In neither post-trial motion did Stonebridge challenge the directed verdict on the breach of contract cause of action, the discovery order, the sufficiency of the evidence to support the finding it breached the covenant of good faith and fair dealing, or the fraud finding, which latter finding is the predicate to an award of punitive damages. (Civ. Code, § 3294.)

The trial court denied Stonebridge's JNOV motion. On the new trial motion, after conducting the constitutional analysis under *State Farm*, *supra*, 538 U.S. at page 419, the

9

trial court reduced the punitive damage award to a ratio of punitive to compensatory damages of 10:1. The trial court explained it "may be unlikely that a punitive damage award reduced to a 10:1 ratio will deter Stonebridge from engaging in similar tortious conduct in the future," but the court felt "constrained to reduce the punitive damage award to 10:1 based on recent California and federal authority." In calculating the amount of punitive damages, the court considered only the $35,000 in compensatory damages for Stonebridge's breach of the implied covenant; it did not include the $31,500 in damages for the insurer's breach of contract or the $12,500 in attorney fees. Accordingly, the court conditionally granted Stonebridge's new trial motion unless Nickerson consented to a remittitur of the punitive damage award to $350,000, in which event the new trial motion would be denied.

The trial court entered a judgment on June 13, 2011, awarding Nickerson compensatory damages of $31,500 for breach of contract and $35,000 for breach of the implied covenant, plus $12,500 in attorney fees as economic damages, $30,603.45 in costs, and $19 million in punitive damages.

Nickerson rejected the reduction in punitive damages and filed a timely appeal from the order granting a new trial. (Code Civ. Proc., § 904.1, subd. (a)(4).) As a consequence of Nickerson's refusal to accept the remittitur of damages, the trial court's ruling on the new trial motion constitutes an order granting a new trial. (See *DeTomaso v. Pan American World Airways, Inc*. (1987) 43 Cal.3d 517, 524.)

Stonebridge timely appealed from the June 13, 2011 judgment and the denial of its JNOV motion. (Code Civ. Proc., § 904.1, subd. (a)(4).)

**CONTENTIONS**

Neither party challenges the judgment of liability or the jury instructions employed at trial. Accordingly, we address neither the correctness of the liability judgment nor the instructions. (See *Simon*, *supra*, 35 Cal.4th at p. 1171, fn. 1.) The contentions on appeal raise only the question of whether the remitted punitive damage award passes constitutional muster under the due process clause.

10

Nickerson contends the trial court erred (1) in concluding it was constrained by law to limit punitive damages to no more than 10 times the compensatory award; and (2) in excluding certain categories of compensatory damages when fixing the ratio of compensatory to punitive damages.

Stonebridge contends the trial court erred in failing to rule on the merits of its JNOV motion seeking a greater reduction of the punitive damage award because (1) there is a low degree of reprehensibility and Nickerson only suffered non-economic damages, and because (2) the evidence does not support the jury's finding that Stonebridge acted with fraud.

## DISCUSSION

1. *The parties agree the jury's special verdict responses with respect to the requirements of Civil Code section 3294, subdivision (a) are not inconsistent.*

By way of background, the jury was given a special verdict form that asked it to answer separately whether Stonebridge's conduct involved "oppression," "malice," or "fraud." The jury answered these three questions, "No" as to oppression, "No" as to malice, and "Yes" as to fraud. (Civ. Code, § 3294, subd. (a).)

On this court's own motion prior to oral argument, we requested supplemental briefing on an issue related to a theoretical inconsistency in this special verdict form. Specifically, the issue was whether the jury's finding of no malice was inconsistent with the jury's affirmative finding of fraud, in that the statutory definitions of both malice and fraud contain an element of injurious intent. (Civ. Code, § 3294, subd. (c).)[2]

---

**2**      Civil Code section 3294 provides in pertinent part at subdivision (c): "(1) 'Malice' means conduct which is *intended by the defendant to cause injury to the plaintiff* or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others. [¶] (2) 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. [¶] (3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the *intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury*." (Italics added.)

11

The parties, in their supplemental briefs and at oral argument, agreed the issue addressed in the request for supplemental briefing is not legally tenable. Stonebridge, in particular, recognized that case law confirms that "oppression," "fraud," or "malice" are stated in the disjunctive (Civ. Code, § 3294, subd. (a)) and a plaintiff may prove entitlement to punitive damages by relying on any or all of the three bases. (See, e.g., *Las Palmas Associates. v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1239.) Stonebridge conceded "the jury's findings are not inconsistent" and that in any event, this court has a duty to harmonize the statute so as to effectuate its various provisions.

Notwithstanding the parties' unanimity on this issue, the dissent takes the position that the jury's special verdict responses are inconsistent on their face so that the verdict is not sustainable. (dis. p. 1.) Thus, we have an extraordinary situation in which the dissenting opinion is arguing for reversal on a basis expressly eschewed by the party it would benefit.

As the Supreme Court stated in *Neary v. Regents of University of California* (1992) 3 Cal.4th 273: "The primary purpose of the public judiciary is 'to afford a forum for the settlement of litigable matters between disputing parties.' [Citation.] We do not resolve abstract legal issues, *even when requested to do so*. We resolve real disputes between real people. [Citation.]" (*Id*. at pp. 281-282, italics added.) Here, we were not even requested to resolve the issue addressed by the dissent. In sum, given the parties' consensus that the verdict is not inconsistent, the issue requires no further discussion.[3]

We now turn to the only issue raised on appeal, namely, whether the remitted punitive damage award of $350,000 is legally proper.

---

[3] We agree with the dissent that jurors should not be presented with a special verdict form that requests them to make discrete findings as to oppression, fraud, or malice. Such interrogatories are unnecessary and serve only to open the verdict to post-trial challenges, as demonstrated by the controversy raised by the dissent.

12

2. *The maximum constitutionally permissive punitive damage award*

"Punitive damages may be imposed under state law to further a state's legitimate interests in punishing unlawful conduct and deterring its repetition. [Citation.] States have considerable flexibility in determining the appropriate level of punitive damages to allow in different classes of cases and in any particular case. [Citation.] The amount of punitive damages offends due process under the Fourteenth Amendment as arbitrary only if the award is ' "grossly excessive" ' in relation to the state's legitimate interests in punishment and deterrence. [Citations.]" (*Bullock v. Philip Morris USA, Inc*. (2011) 198 Cal.App.4th 543, 558.)

In determining the constitutional maximum for a particular punitive damage award under the due process clause, we are directed to follow three guideposts: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. [Citation.]" (*State Farm*, *supra*, 538 U.S. at p. 418, citing *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559, 575 (*Gore*).)

Appellate courts conduct de novo review of a trial court's application of the guideposts to the jury's punitive damage award. (*State Farm*, *supra*, 538 U.S. at p. 418; *Simon*, *supra*, 35 Cal.4th at p. 1172; accord *Gober v. Ralphs Grocery Co.* (2006) 137 Cal.App.4th 204, 212.) "Exacting appellate review ensures that an award of punitive damages is based upon an ' "application of law, rather than a decisionmaker's caprice." ' [Citations.]" (*State Farm*, *supra*, at p. 418.) We accept as true the jury's findings of historical fact as long as they are supported by substantial evidence (*Simon*, *supra*, at p. 1172; *Gober*, *supra*, at p. 216), but we do not defer to findings inferred from the jury's award. (*Simon, supra,* at pp. 1172-1173.) We are always conscious, however, that "[o]ur task here is only to determine the *maximum permissible* award under the Constitution, which is not necessarily the same award we would reach as jurors. [Citation.]" (*Roby v. McKesson Corp*. (2009) 47 Cal.4th 686, 720 (conc. & dis. opn. of Werdegar, J.) (*Roby*).)

13

With these rules in mind, we address seriatim the three guideposts delineated by the United States Supreme Court.

a. *Degree of reprehensibility*

" '[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.' " (*State Farm*, *supra*, 538 U.S. at p. 419; *Gore*, *supra*, 517 U.S. at p. 575; accord, *Simon*, *supra*, 35 Cal.4th at p. 1180; *Roby*, *supra*, 47 Cal.4th at p. 713.)  We determine the reprehensibility of Stonebridge's behavior by considering five aggravating factors, namely "whether: [(1)] the harm caused was physical as opposed to economic; [(2)] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [(3)] the target of the conduct had financial vulnerability; [(4)] the conduct involved repeated actions or was an isolated incident; and [(5)] the harm was the result of intentional malice, trickery, or deceit, or mere accident.  [Citation.]  The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.  [We presume Nickerson] has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if [Stonebridge's] culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.  [Citation.]" (*State Farm*, *supra,* at p. 419.)  The parties dispute the application of all five of the reprehensibility factors and so we address them seriatim.

(i)    *Nickerson did not suffer physical harm.*

The first factor is whether the harm caused to Nickerson was physical or economic.  Nickerson's injuries were solely economic as they "arose from a transaction in the economic realm, not from some physical assault or trauma" and "there were no physical injuries." (*State Farm*, *supra*, 538 U.S. at p. 426.)  Nickerson's counsel admitted as much in closing argument by stating: "Number 1 is whether the conduct caused physical harm.  Obviously, it did not in this case.  There was no – physical harm

14

to Mr. Nickerson. There was emotional harm, and you've already compensated – him for his emotional harm."

Despite having conceded the lack of physical harm at trial, on appeal Nickerson asserts he did suffer physical harm and cites *Roby*, *supra*, 47 Cal.4th 686 that when the defendant's conduct causes damage that affects the plaintiff's emotional and mental health, it is treated as physical harm. *Roby* is distinguished as the plaintiff there experienced physical manifestations of her emotional distress: she developed agoraphobia, became suicidal, forewent medical treatment, and was deemed "completely disabled." (*Id*. at p. 697.) Nickerson, by contrast, testified he felt upset, frustrated, angry, and betrayed. The trial court found him to be a "stoic man who did not appear comfortable talking about his feelings in response to his attorney's questions." Nickerson never testified he suffered physical effects from Stonebridge's conduct. Nor is the difference between the harm suffered by Nickerson and that suffered by Roby simply a matter of degree, as Nickerson would have it. The record contains no indication that Nickerson suffered any physical symptoms of his emotional distress and so this factor does not apply.

> (ii) *Stonebridge acted with indifference to, and a reckless disregard of, the health or safety of Nickerson and others.*

The second factor is whether Stonebridge's tortious conduct evinced its indifference to or reckless disregard of the health and safety of others. Nickerson is paralyzed from his chest down and relies on a wheelchair. He obtained his policy with Stonebridge for peace of mind and security. (*Amerigraphics, Inc. v. Mercury Casualty Co*. (2010) 182 Cal.App.4th 1538, 1562 (*Amerigraphics*).) Yet, the evidence shows Stonebridge recklessly disregarded Nickerson's health and safety: Stonebridge (1) refused to provide Dr. Nguyen's letter to the peer reviewer and refused to recognize that Nickerson required hospitalization for 109 days; (2) declined coverage on the grounds the hospitalization at the Long Beach VA Hospital was not the most economically and medically appropriate site for Nickerson's treatment which ignores the fact that hospital care was free of charge for Nickerson and, as Hammer acknowledged,

that VA hospitals did not hospitalize patients unnecessarily; (3) required that Nickerson's care be "acute" to be covered, notwithstanding the policy did not specify this predicate to coverage; and (4) expected that Nickerson should have returned home despite his doctors' conclusion he could not be safely discharged. We reject Stonebridge's attempts to minimize its conduct by arguing that the only harm Nickerson suffered was his inability to purchase a new van. This argument ignores not only that Stonebridge's practice caused Nickerson to suffer personal injury, but also that the van, outfitted to meet his needs, is essential to Nickerson's safety and well being.

In addition to its treatment of Nickerson, the record reveals Stonebridge's indifference to the health and safety of others through its practice of using the hidden "Necessary Treatment" limitation to deny other policyholders' claims and by preventing full communication between peer reviewers and treating physicians. Stonebridge's argument that it is not a health insurer does not alter our conclusion. Its practices affect insureds' hospitalization decisions. (Cf. *Sarchett v. Blue Shield of California* (1987) 43 Cal.3d 1, 11 [dilemma faced by insured: follow recommendation of physician and risk later denial of coverage or reject doctor's advice and risk foregoing needed treatment].) This factor weighs in favor of a finding of reprehensibility.

(iii)    *The target of the conduct is financially vulnerable.*

The third factor, "whether . . . the target of the conduct had financial vulnerability" (*State Farm*, *supra*, 538 U.S. at p. 419), is ordinarily "relevant only if financial vulnerability made the target more vulnerable to the defendant's wrongful conduct or exacerbated the harm, such as where the harm caused by the defendant's conduct was economic. [Citations.]" (*Bullock v. Philip Morris USA, Inc.*, *supra*, 198 Cal.App.4th at pp. 561-562, citing *Gore*, *supra*, 517 U.S. at p. 576 ["infliction of economic injury, especially when done intentionally through affirmative acts of misconduct [citation] or when the target is financially vulnerable, can warrant a substantial penalty"].) Nickerson is clearly financially vulnerable: he is a permanently disabled 58-year-old paraplegic and a former marine whose only source of income is a paltry military pension. Stonebridge insists that Nickerson's income was not affected by its decision to deny him his policy

benefits because his pension was unaffected by the hospital stay and his medical treatment was free. Stonebridge argues Nickerson is not financially vulnerable because, quoting from *Amerigraphics*, *supra*, 182 Cal.App.4th at page 1562, he did not "need[] the money to survive," and reiterates that the only harm Nickerson actually suffered was his inability to purchase a new van. Such argument trivializes Nickerson's plight. Nickerson has extremely limited financial resources and needed the proceeds from his Stonebridge policy to replace his 10-year-old, specially modified van, which vehicle had 250,000 miles on it and was unsafe. Merely because Nickerson could *survive* without the policy proceeds does not mean Stonebridge's conduct did not affect his solvency or that he was financially invulnerable. This factor weighs in favor of reprehensibility.

(iv)    *Stonebridge's conduct involved repeated actions; it was not an isolated incident.*

This fourth factor considers whether the tortfeasor was recidivist, i.e., whether its conduct involved repeated actions or was an isolated incident. (*State Farm*, *supra*, 538 U.S. at p. 419.) Reprehensibility is "influenced by the frequency and profitability of the defendant's prior or contemporaneous similar conduct." (*Johnson v. Ford Motor Co.* (2005) 35 Cal.4th 1191, 1207.) "Action taken or omitted in order to augment profit represents an enhanced degree of punishable culpability . . . ." (*Exxon Shipping Co. v. Baker* (2008) 554 U.S. 471, 494.) Hence, in reviewing punitive damages, due process allows courts to consider the defendant's "illegal or wrongful conduct towards others that was similar to the tortious conduct that injured the plaintiff or plaintiffs. . . . [A] civil defendant's recidivism remains pertinent to an assessment of culpability." (*Johnson v. Ford Motor Co.*, *supra*, at p. 1204.) "[A] recidivist may be punished more severely than a first offender [because] repeated misconduct is more reprehensible than an individual instance of malfeasance." (*Gore*, *supra*, 517 U.S. at p. 577.)

Stonebridge does not appeal from the directed verdict finding that its policy's "Necessary Treatment" definition was a limitation of coverage that was unenforceable. The evidence shows that Stonebridge had a business practice of employing that same "Necessary Treatment" definition to deny claims for hospitalization or emergency room

17

visits submitted by other insureds in addition to Nickerson.[4] Thus, Stonebridge repeatedly relied on an unenforceable provision to deny coverage to its insureds. Additionally, Stonebridge utilized the same bad faith claims-handling practice against others that it used against Nickerson. Neither Hammer nor anyone she knew at Stonebridge *ever requested a medical peer reviewer contact the treating physician,* and Stonebridge's vice president of claims testified that the claims-handling procedure utilized by Hammer was authorized at the corporate level. Thus, Stonebridge had a practice of obstructing communication between outside reviewers and the insureds' treating doctors. Stonebridge clearly placed its interests above that of its insureds and repeatedly profited both from the sale of such unlawful insurance policy clauses to Nickerson and others, and from its wrongful claims-handling practices. Indeed, Stonebridge did not appeal from the jury verdict of liability on the bad faith cause of action. Manifestly, the denial of coverage here was the result of a practice repeatedly utilized, and not an isolated incident. This factor weighs in favor of a finding of a high degree of reprehensibility.

We reject out of hand Stonebridge's suggestion that the trial court improperly permitted the jury to punish it for its handling of other insureds' claims. California has the "constitutional freedom to use punitive damages as a tool to protect the consuming

---

[4]    Stonebridge asserts without any citation to the record that the trial court permitted Nickerson to admit into evidence "unauthenticated records" of Stonebridge's denials of claims to 225 other Californians based on the "Necessary Treatment" definition (Exhibits 33 & 36) "over Stonebridge's objection." We are unable to locate any place in the record where Stonebridge objected to admission of these exhibits and Stonebridge cites us to none. In fact, Exhibit 36 is Stonebridge's own response to interrogatories. Accordingly, even were we to conclude the evidence was inadmissible -- a determination we do not make -- Stonebridge has forfeited any objection to the admission of these exhibits. (*Platzer v. Mammoth Mountain Ski Area* (2002) 104 Cal.App.4th 1253, 1260.)

    Stonebridge also suggests that the evidence does not support a finding of recidivism by inviting us to reevaluate Exhibits 33 and 36, admitted into evidence. We have reviewed the record, including the exhibits Stonebridge cites. They show that Stonebridge repeatedly utilized the same "Necessary Treatment" provision to deny claims to other insureds.

18

public, not merely to punish a private wrong." (*Johnson v. Ford Motor Co.*, *supra*, 35 Cal.4th at p. 1206.) "To consider the defendant's entire course of conduct in setting or reviewing a punitive damages award . . . is not to punish the defendant for its conduct toward others. An enhanced punishment for recidivism does not directly punish the earlier offense; it is, rather, ' " 'a stiffened penalty for the last crime, which is considered to be an aggravated offense because a repetitive one.' " ' [Citation.] . . . By placing the defendant's conduct on one occasion into the context of a business practice or policy, an individual plaintiff can demonstrate that the conduct toward him or her was more blameworthy and warrants a stronger penalty to deter continued or repeated conduct of the same nature." (*Id*. at pp. 1206–1207, fn. 6.)

Stonebridge argues that this reprehensibility factor is absent here because the record lacks any evidence that it was aware that the "Necessary Treatment" definition was unenforceable at the time it denied Nickerson's and others' claims for that reason. Thus, Stonebridge argues, it did not enforce a policy provision it knew was unenforceable. It goes without saying that if Stonebridge seeks to do business in California it must follow California law. (See Cal. Code Regs., tit. 10, § 2695.1, subd. (e) [governing unfair or deceptive acts or practices in the business of insurance and stating, "All licensees, as defined in these regulations, shall have thorough knowledge of the regulations contained in this subchapter"].) It has long been the law in California that "Any provision purporting to limit coverage must be ' "conspicuous, plain and clear." ' [Citation.]" (*Holcomb v. Hartford Casualty Ins. Co*. (1991) 230 Cal.App.3d 1000, 1006; accord, *State Farm Mut. Auto Ins. Co. v. Jacober* (1973) 10 Cal.3d 193, 201-202.) Merely because those prior similar incidents did not result in an earlier finding of bad faith does not entitle Stonebridge to keep this clause in the policy with impunity until a court finds it is unenforceable. Historical evidence shows prior similar incidents in which Stonebridge relied on the "Necessary Treatment" definition to limit coverage. The focus of this reprehensibility factor is on "the frequency and profitability of the defendant's prior or contemporaneous similar conduct." (*Johnson v. Ford Motor Co*., *supra*, 35 Cal.4th at p. 1207; *Exxon Shipping Co. v. Baker*, *supra*, 554 U.S. at p. 494.) The

19

evidence shows that Stonebridge did profit repeatedly thereby. This reprehensibility factor weighs against the insurer.[5]

       (v)     *The harm was the result of intentional deceit, not mere accident.*

Turning to the fifth factor, the harm Nickerson suffered as the result of Stonebridge's conduct was not accidental, but the result of a deceitful practice designed to deny him his policy benefits. The jury found Stonebridge engaged in fraud, defined in the instructions thusly, " 'Fraud' means that Stonebridge . . . intentionally misrepresented or concealed a material fact and did so, intending to harm . . . Nickerson." Thus, the jury found Stonebridge engaged in "*intentional* misrepresentation, deceit, or concealment" (Civ. Code, § 3294, subd. (c)(3), italics added), and so Stonebridge's conduct was necessarily not accidental.[6]

Stonebridge contends there is no evidence it committed fraud, with the result there is no basis for the predicate finding justifying any punitive damage award. (Civ. Code,

---

[5]     Stonebridge argues that the discovery sanction order and instruction to the jury that it did not comply with two court orders to produce documents cannot be used to support a reprehensibility finding because its litigation conduct was not the subject of the bad faith claim upon which the punitive damages award was premised. (*De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 918.) Regardless of whether the jury improperly folded this fact into its calculation of the punitive damage award, we do not consider Stonebridge's litigation conduct in our de novo determination of whether the remitted punitive damage award is constitutionally defensible under the due process clause.

[6]     In challenging this reprehensibility factor, Stonebridge relies on *Amerigraphics*, *supra*, 182 Cal.App.4th 1538. *Amerigraphics* held that the defendant Mercury's offensive claims-handling conduct "ultimately involved only one insured" and the evidence fell short of demonstrating the insurer defendant's conduct constituted "intentional malice." (*Id.* at p. 1563.) The court reasoned although the insurers' claims-handling was egregious, the evidence did not "suggest that Mercury was guided by this goal from the outset." (*Ibid.*) Stonebridge's reliance is misplaced. Unlike *Amerigraphics*, Stonebridge's denial of coverage was the result of a concerted practice of wrongfully relying on an unenforceable policy provision and bad faith claims-handling practice that affected others. Stonebridge's denials either predated or were contemporaneous with its denial of Nickerson's claim. Stated otherwise, this was Stonebridge's goal from the outset.

20

§ 3294, subd. (a).)  We disagree.  In the context of punitive damages, "[a]ll that is required is that the fraud must equate to the conduct which gives rise to liability – in this case bad faith.  [Citation.]" (*Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 947-948.)  Civil Code section 3294 defines fraud as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (Civ. Code, § 3294, subd. (c)(3).)  The defendant must have "actively sought an injury to" the plaintiff's rights, and "not [be] merely indifferent to" those rights.  (*Simon*, *supra*, 35 Cal.4th at p. 1181.)

We are guided by the basic rules of appellate review (*Gyerman v. United States Lines Co.* (1972) 7 Cal.3d 488, 492, fn. 1) that do not limit us to the evidence specified in closing argument.  Accordingly, the historical evidence shows first that Stonebridge limited the scope of its promise of coverage by burying it in the definition of "Necessary Treatment," which constitutes a concealment designed to increase Stonebridge's profits by depriving policy holders of their policy benefits.  Second, Stonebridge's practice was never to authorize peer reviewers to communicate with treating physicians, thus intentionally concealing material information from the claims' functional decision-maker so as to limit the amount Stonebridge would have to pay out on its policies.[7]  With particular reference to Nickerson, Stonebridge deliberately withheld Dr. Nguyen's letter from its peer reviewer.  As Stonebridge requested his medical records, Nickerson would reasonably understand that his physician's treatment decisions would be considered by the peer reviewer.  Stonebridge was required to fully inquire into possible bases that might support Nickerson's claim.  (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819.)  Instead, in withholding Dr. Nguyen's letter from the outside reviewer,

---

[7]     In its supplemental briefs, Stonebridge points to Hammer's testimony that the insurer does not have a policy of prohibiting reviewing doctors from consulting with treating physicians.  Nonetheless, the jury was entitled to infer that Stonebridge had a *custom and practice* of never checking the box allowing the peer reviewer to consult with the treating physician given Hammer's testimony that neither she nor anyone at Stonebridge had ever requested a reviewer contact the treating physician.

21

Hammer screened the mail to be sent to the reviewer and made what is essentially a medical decision that the letter contained no new information.  Insurers may not ignore the opinion of treating physicians absent a showing the physician's judgment is either "plainly unreasonable, or contrary to good medical practice."  (*Sarchett v. Blue Shield of California*, *supra*, 43 Cal.3d at p. 13.)  By obstructing unfettered communication between the treating physician and the reviewer, Stonebridge deprived Nickerson of his legal right to his policy proceeds.

Stonebridge disagrees that its failure to check the box on the transmittal form allowing the peer reviewer to speak with the treating physician constituted fraud. Stonebridge argues the box refers only to the " 'type of review' " requested and otherwise it had no obligation to ensure that the peer reviewer speak with the primary care physician.  Stonebridge adds that in any event the peer reviewer received all the medical records of Nickerson's hospital treatment.

However, the box authorizing this communication exists on the transmittal form and so the failure to check it precludes contact and erects a barrier to the free flow of pertinent communication.  " 'Jurors, not appellate justices, hear the evidence and determine the facts.  Properly instructed, they are the primary arbiters of acceptable behavior between an insurer and its insured.  It is they, with their collective understanding of the limits of what decent citizens ought to have to tolerate, who are charged with assessing the degree of reprehensibility and meting out an appropriate financial disincentive for untoward claims practices.  Their authority is not unbridled. However, our role in reviewing the jury's work is a deferential one.' " (*Amerigraphics, supra*, 182 Cal.App.4th at p. 1560.)  Here, substantial evidence supports the jury's finding Stonebridge committed fraud as defined in Civil Code section 3294, subdivision (c)(3) to justify punitive damages in the first place.  In turn, this evidence demonstrates the fifth reprehensibility factor, namely that "the harm [Nickerson suffered] was the result of intentional . . . deceit," and not mere accident. (*State Farm*, *supra*, 538 U.S. at p. 419.)

22

To summarize, four of the five aggravating factors of reprehensibility are present here.  Based on Stonebridge's conduct, we conclude its culpability is sufficiently reprehensible as to warrant the imposition of sanctions to punish and deter.  (*State Farm*, *supra*, 538 U.S. at p. 419.)

b.  *Comparable civil penalties*

Considering the third guidepost next, it requires us to consider "the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." (*State Farm*, *supra*, 538 U.S. at p. 418.)  The trial court here relied on penalties imposed by the Department of Insurance of $10 million and $3.6 million.  While we may consider both civil penalties actually imposed and those authorized in comparable cases (*Boeken v. Philip Morris, Inc*. (2005) 127 Cal.App.4th 1640, 1699), the penalties the trial court considered are not analogous to this situation because they involved the wrongful *rescission* of entire medical insurance policies, not the wrongful restriction of coverage.  Rather than pointing us to a penalty that parallels this case, Nickerson concedes that this guidepost "is of limited utility," where Stonebridge is only liable for breach of a common law tort duty.  (*Simon*, *supra*, 35 Cal.4th at p. 1184.)  Therefore, we do not consider this guidepost in "the calculus of the constitutional maximum of punitive damages." (*Amerigraphics*, *supra*, 182 Cal.App.4th at p. 1566.)

c.      *The ratio of punitive damages to actual or potential harm*

(i)      *The legal principles*

Turning to the second of the *Gore* guideposts, the ratio between punitive and compensatory damages is "a *central feature* in [the] due process analysis." (*Exxon Shipping Co. v. Baker*, *supra*, 554 U.S. at p. 507, italics added.)  It is likewise the central issue in this appeal.  Nickerson contends that the punitive damage award should be fixed at greater than the 10:1 ratio the trial court employed.  Stonebridge contends in its briefs that a ratio of 10:1 was excessive under the *State Farm* guidelines and the facts of this case. (*State Farm*, *supra*, 538 U.S. at p. 418.)

23

Punitive damages must bear a " 'reasonable relationship' " to compensatory damages or to the plaintiff's actual or potential harm.  (*Gore*, *supra*, 517 U.S. at pp. 575, 580; *State Farm*, *supra*, 538 U.S. at pp. 424-426; accord, *Bullock v. Philip Morris USA, Inc.*, *supra*, 198 Cal.App.4th at p. 563.)  "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  (*State Farm*, *supra*, at p. 426.)

The Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," and "reiterate[d its] rejection of a categorical approach."  (*Gore*, *supra*, 517 U.S. at p. 582.)  Although repeatedly declining to establish a ratio beyond which a punitive damage award could not exceed (*State Farm*, *supra*, 538 U.S. at pp. 424-425), the high court found "instructive" decisions approving ratios of four to one, and recognized that in the past, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process."  (*Id*. at p. 425.)

In California, our Supreme Court discerned the following presumption from the high court's endorsement of single-digit ratios:  "ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages *significantly greater* than 9 or 10 to 1 are suspect and, absent special justification (by, for example, extreme reprehensibility or unusually small, hard-to-detect or hard-to-measure compensatory damages), cannot survive appellate scrutiny under the due process clause."  (*Simon*, *supra*, 35 Cal.4th at p. 1182, italics added, fn. omitted.)  Although "a ratio significantly greater than single digits 'alerts the court[] to the need for special justification' [citations]" (*ibid.*) "the presumption of unconstitutionality applies only to awards exceeding the single-digit level '*to a significant degree.*' "  (*Id*. at p. 1182, fn. 7, quoting from *State Farm*, *supra*, 538 U.S. at p. 425, italics added.)

Yet, multipliers of *less than* nine or 10 "are *not . . . presumptively valid* under *State Farm* . . . [e]specially when the compensatory damages are substantial or already contain a punitive element. . . .  [Citation.]"  (*Simon*, *supra*, 35 Cal.4th at p. 1182, first italics added.)  Our Supreme Court disagreed that a multiplier of four times the

24

compensatory damages was the " 'outer constitutional limit,' " because *State Farm* declared that " 'these ratios are *not binding*,' but only 'instructive.' [Citation.]" (*Id.* at pp. 1182-1183; quoting from *State Farm*, *supra*, 538 U.S. at p. 425.) Our " 'function is to police a range, not a point' [citation]." (*Simon*, *supra*, at p. 1183.)

The message to be gleaned is that the due process analysis is flexible and depends on the circumstances in determining proportionality. (See *State Farm*, *supra*, 538 U.S. at p. 425; *Gore*, *supra*, 517 U.S. at p. 582; *Simon*, *supra*, 35 Cal.4th at p. 1189.) As *State Farm* explicated, "because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.' [Citations.] (positing that a higher ratio *might* be necessary where 'the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine'). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*State Farm*, *supra*, at p. 425, quoting *Gore*, *supra*, at p. 582; see *Simon*, *supra*, at p. 1182.) In short, "whether punitive damages must be limited to the amount of compensatory damages, or any other amount, to satisfy due process depends on the reviewing court's consideration of the three guideposts and the defendant's financial condition, and the facts and circumstances in each case." (*Bullock v. Philip Morris USA, Inc.*, *supra*, 198 Cal.App.4th at p. 565.)

(ii)     *Based on these principles, the trial court's remittitur falls within the maximum permitted by due process.*[8]

*Simon* involved a defendant who was found to have committed promissory fraud that stymied the plaintiff's attempt to purchase an office building from the defendant.

---

[8]     Clearly, the jury's award here, which amounts to a ratio of 543:1 is " 'breathtaking' " and "far outside the 'single-digit neighborhood' [citation] suggested by the high court in *State Farm*." (*Simon*, *supra*, 35 Cal.4th at p. 1183.)

(*Simon*, *supra*, 35 Cal.4th at p. 1166.) The jury awarded the plaintiff $5,000 in compensatory damages and $1.7 million in punitive damages. (*Ibid*.) The Supreme Court applied the *Gore* guideposts and concluded only one of the five reprehensibility factors was present (*id*. at p. 1181), and the compensatory award was "quite small," consisting of only economic damages that measured the actual harm done to the plaintiff and containing no punitive element (*id*. at p. 1189). *Simon* determined that the "nature and size of the compensatory award . . . militates for a maximum award at the top of, but not significantly beyond, the single-digit range," and concluded a ratio of 10 to 1 was consistent with due process. (*Ibid.*) The Supreme Court explained, "[i]n some cases, the defendant's financial condition may combine with high reprehensibility and a low compensatory award to justify an extraordinary ratio between compensatory and punitive damages. [Citation.]" (*Id.* at p. 1186.)

That is exactly what occurred here: Stonebridge's conduct evinces a higher level of reprehensibility than in *Simon*; four out of the five reprehensibility factors are present here. Nickerson received a small amount of compensatory damages for his personal injury, for which the monetary value was difficult to determine because, as the trial court noted, Nickerson was "stoic" during his testimony. Nickerson's $35,000 tort award contains no punitive element as that award was to compensate him for his emotional distress, not to punish Stonebridge. Unlike *State Farm*, where the plaintiffs were fully compensated for their economic injury before the lawsuit was brought and so their substantial emotional distress award was solely punitive in nature (*State Farm*, *supra*, 538 U.S. at p. 426), Nickerson's $35,000 award only compensates him for the personal injuries he suffered from Stonebridge's bad faith. (See also *Walker v. Farmers Ins. Exchange* (2007) 153 Cal.App.4th 965, 974 [plaintiffs recovered substantial economic damages and emotional distress damages containing a punitive element].)

Based on our application of the *Gore* guideposts to the facts and circumstances of this case, Stonebridge's reprehensible conduct that resulted in only a relatively small economic damage award, and Stonebridge's $368 million net worth, a significant ratio of punitive to compensatory damages comports with due process. We hold the trial court

26

properly remitted the jury's award to the outside constitutional limit of a 10:1 ratio of punitive to compensatory damages.

Nickerson and Amicus Curiae, United Policyholders, argue that in view of the small size of the compensatory damages awarded Nickerson, a ratio of something larger than the 10:1 in the remittitur is called for. They point to the trial court's concern that where Stonebridge's conduct was highly reprehensible, a multiplier of 10 to 1 may function simply as a cost of doing business. Thus, they argue, the court should have fixed a larger ratio to achieve a more effective deterrent. While we agree with Nickerson and Amicus Curiae that Stonebridge may fold this award into its cost of doing business, we also agree with the trial court that we are constrained by case law and the Constitution. The nature and size of Nickerson's compensatory damage award does not justify a punitive damage award beyond the constitutional maximum. While Stonebridge's financial condition is an essential consideration to be factored into our analysis, it alone cannot justify exceeding what due process will allow. We have considered these facts in our analysis. We conclude that 10:1 is the maximum constitutionally defensible ratio.

d. *Additional considerations*

To alter the ratio of punitive to compensatory damages, Nickerson contends the trial court erred in failing to measure the punitive damage award against additional categories of compensatory damages, i.e., uncompensated potential harm, the policy benefits, and the *Brandt* fees. We disagree. First, Nickerson was fully compensated for his emotional distress injuries, as he acknowledged in closing argument, and he does not demonstrate what potential harm went uncompensated. (See *Simon*, *supra*, 35 Cal.4th at p. 1174 [appellant identified $400,000 in uncompensated harm].) Second, the trial court properly declined to include the policy benefits in its ratio calculation as punitive damages are not authorized in contract actions. (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1224.) Finally, *Brandt* fees are not properly included in determining the compensatory damage award when they are awarded by the trial court *after* the jury awards punitive damages. (*Amerigraphics*, *supra*, 182 Cal.App.4th at p. 1565.) *Major v. Western Home Ins. Co.*, cited by Nickerson, does not alter our

27

conclusion because there, the jury awarded *Brandt* fees as part of the tort damages. (*Major v. Western Home Ins. Co*., *supra*, at p. 1224.)  Thus, the trial court properly included all of the relevant damages in the denominator of its ratio.

Stonebridge asserts that its net worth "cannot justify an otherwise unconstitutionally permissible ratio."  As noted, under California law, one of "the essential factor[s] in fixing an amount" of a punitive damage award is "the defendant's financial condition" so as to "serve these goals [of punitive damage awards] without exceeding the necessary level of punishment."  (*Simon*, *supra*, 35 Cal.4th at p. 1185.) " '[O]bviously, the function of deterrence . . . will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.'  [Citation.] '[P]unitive damage awards should not be a routine cost of doing business that an industry can simply pass on to its customers through price increases, while continuing the conduct the law proscribes.'  [Citation.]"  (*Id*. at p. 1185.)  Stonebridge's net worth of $368 million does not justify an *impermissible* ratio, but it certainly factors into the determination of the maximum ratio tolerated by the Constitution.

## DISPOSITION

The order denying the motion for judgment notwithstanding the verdict is affirmed. The order granting new trial is vacated. The trial court is directed to modify the June 13, 2011 judgment by reducing the punitive damage award to $350,000. As modified, the judgment is affirmed. Nickerson is to recover costs on appeal.

**CERTIFIED FOR PUBLICATION**

ALDRICH, J.

I concur:

KLEIN, P. J.

29

CROSKEY, J., Dissenting.

I respectfully dissent. While the majority opinion is primarily concerned with the amount of punitive damages, I believe that the record before us does not provide the necessary evidentiary basis for concluding that the predicate requirements of Civil Code section 3294, subdivision (a)[1] were met. I have two serious problems with the trial court's determination that an award of punitive damages was appropriate. First, the jury's special verdict is internally inconsistent. Second, the jury's finding of fraud is not supported by substantial evidence.

The jury's special verdict responses with respect to the requirements of Civil Code section 3294(a) are inconsistent on their face. The jury was given a special verdict form that asked it to answer *separately* whether the conduct of defendant Stonebridge Life Insurance Company (Stonebridge) involved "malice," "oppression" or "fraud." The jury answered these three questions, "No" as to malice, "No" as to oppression and "Yes" as to fraud. In light of the instructions actually given by the court on "malice" and "fraud," I believe that the finding of fraud is inconsistent with the finding of no malice.[2]

An inconsistent verdict ordinarily requires a reversal for a new trial. In this case, however, a new trial is not warranted as there is no substantial evidence to support the jury's finding of fraud. As a result, Stonebridge is entitled to a judgment that awards no punitive damages. I therefore would reverse the order granting a new trial on punitive damages, modify the judgment by striking the punitive damage award, affirm the

---

[1]    Civil Code section 3294, subdivision (a) provides: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of *oppression, fraud, or malice*, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." (Italics added.)

[2]    This court requested supplemental briefing from the parties addressing the questions (1) "Are the special verdict findings on malice and oppression on the one hand and fraud on the other fatally inconsistent?" and (2) "If so, is a new trial necessarily required, or is Stonebridge Life Insurance Company entitled to a judgment awarding no punitive damages if it shows in this appeal that there is no substantial evidence to support the jury's finding that it engaged in the conduct with fraud?"

1

judgment as so modified and dismiss as moot Stonebridge's appeal from the order denying its motion for judgment notwithstanding the verdict (JNOV).

1.    *The Special Verdict Findings Are Inconsistent*

a.    *Applicable Law*

"A special verdict is inconsistent if there is no possibility of reconciling its findings with each other.  (*Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 [74 Cal.Rptr.3d 235] (*Zagami*).)  If a verdict appears inconsistent, a party adversely affected should request clarification, and the court should send the jury out again to resolve the inconsistency.  (Code Civ. Proc., § 619; *Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456 [72 Cal.Rptr. 217, 445 P.2d 881] (*Woodcock*); *Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 302-303 [96 Cal.Rptr.2d 605] (*Mendoza*).)[3]  If no party requests clarification or an inconsistency remains after the jury returns, the trial court must interpret the verdict in light of the jury instructions and the evidence and attempt to resolve any inconsistency.  (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 540-541 [138 Cal.Rptr. 705, 564 P.2d 857], overruled on another ground in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Woodcock*, *supra*, 69 Cal.2d at pp. 456-457.)

"On appeal, we review a special verdict de novo to determine whether its findings are inconsistent.  (*Zagami*, *supra*, 160 Cal.App.4th at p. 1092.)  With a special verdict, unlike a general verdict or a general verdict with special findings, a reviewing court will not infer findings to support the verdict.  (*Ibid.*; *Mendoza*, *supra*, 81 Cal.App.4th at pp. 302-303.)  ' " 'Where the findings are contradictory on material issues, and the correct determination of such issues is necessary to sustain the judgment, the inconsistency is reversible error.' " [Citations.]'  (*City of San Diego v. D.R. Horton*

---

**3**    "Code of Civil Procedure section 619 states, 'When the verdict is announced, if it is informal or insufficient, in not covering the issue submitted, it may be corrected by the jury under the advice of the court, or the jury may be again sent out.'  An inconsistent verdict is considered 'informal or insufficient' within the meaning of the statute.  (*Mendoza*, *supra*, 81 Cal.App.4th at p. 302.)"

2

*San Diego Housing Co., Inc.* (2005) 126 Cal.App.4th 668, 682 [24 Cal.Rptr.3d 338].) 'The appellate court is not permitted to choose between inconsistent answers. [Citations.]' (*Ibid.*) The proper remedy for an inconsistent special verdict is a new trial. (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344 [100 Cal.Rptr.2d 446].)" (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 357-358 (*Singh*).)

A party is not required to request clarification of the verdict before the jury is discharged or otherwise object to an inconsistent verdict in the trial court in order to preserve the issue for review. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 530; *Zagami*, *supra*, 160 Cal.App.4th at p. 1093, fn. 6; *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1182.)

### b. *The Jury's Findings With Respect to Fraud and Malice Are Inconsistent*

The jury found that Stonebridge had "engage[d] in the conduct with fraud," but also expressly found that it had *not* engaged in the conduct with either malice or oppression. The trial court instructed the jury on CACI No. 3946, which defines "malice," "oppression" and "fraud" based on the definitions in Civil Code section 3294, subdivision (c). Malice, as defined in subdivision (c), requires either (1) "conduct which is intended by the defendant to cause injury to the plaintiff" or (2) "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." " 'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (*Ibid.*) " 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (*Ibid.*)

The plain language of these statutory definitions shows that the terms "malice" and "fraud" have significant overlap. As relevant here, any intentional misrepresentation, deceit or concealment intended by the defendant to deprive the plaintiff of property or legal rights or otherwise cause injury, thereby constituting fraud under the statute, could also be described as conduct intended by the defendant to cause injury to a person, thus

3

constituting malice under the statute.[4]  Nickerson argues that the term "injury" in the statutory definition of "malice" should be interpreted as limited to physical injury to distinguish that term from the loss of "rights," "legal rights" or "property" as stated in the definitions of "oppression" and "fraud."  But, to the contrary, the language "depriving a person of property or legal rights *or otherwise causing injury*" (italics added) in the statutory definition of "fraud" suggests that the term "injury" encompasses the loss of property or legal rights.  This is consistent with the ordinary meaning of the word "injury" as used in this context, which encompasses any loss or harm whether physical, economic, emotional or otherwise.

The trial court instructed the jury, " 'Malice' means that Stonebridge Life Insurance Company acted with intent to cause injury or that Stonebridge Life Insurance Company was despicable—strike that—that Stonebridge Life Insurance Company's conduct was despicable and was done with a willful and knowing disregard of the rights and safety of others."  The court also instructed, " 'Fraud' means that Stonebridge Life Insurance Company intentionally misrepresented or concealed a material fact and did so intending to harm Thomas Nickerson."

A finding of malice under these instructions would require either (1) conduct that Stonebridge intended to cause injury or (2) despicable conduct that was done with a willful and knowing disregard of the rights and safety of others.[5]  A finding of fraud, under these instructions, would require conduct (i.e., an intentional misrepresentation or concealment of a material fact) that Stonebridge engaged in with the intent to harm Nickerson.  Thus, conduct constituting fraud under these instructions also necessarily constitutes malice under the first of the two alternatives (i.e., an intent to cause injury).

---

**4**     It should be noted that "malice" under the statute requires an intent to cause injury to the plaintiff, while "fraud" requires an intent to deprive "a person" of property or legal rights or otherwise cause injury.

**5**     A jury's finding of no malice compels the conclusion that the jury has necessarily rejected both of these two alternatives.

4

The finding of no malice therefore is inconsistent with the finding of fraud, and I can see no way to reconcile the inconsistency between these two express findings.

Nickerson and Stonebridge both argue that the fact that the statute sets forth the definitions of "malice," "oppression" and "fraud" in the disjunctive indicates that the three terms are mutually exclusive.[6] They cite numerous cases standing for the unremarkable proposition that a finding of "fraud" alone under the statute is sufficient to support an award of punitive damages. (E.g., *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1239.)[7] The plain meaning of the statutory language indicates that there is considerable overlap between the first alternative definition of "malice" and "fraud," just as there appears to be considerable overlap between the second alternative definition of "malice" and "oppression." Neither the statutory language nor the legislative history suggests that the three terms were intended to be mutually exclusive. The parties cite no authority, and I am aware of no legal authority or convention of English usage, that items listed in the disjunctive are necessarily mutually exclusive.

Although a finding of any one of the three statutory grounds is sufficient to support a punitive damage award, this does not obviate the need, if possible, to reconcile the findings when the jury expressly and separately finds "yes" as to one or more of the grounds and "no" as to another, as occurred here. In my view, however, the findings here are patently irreconcilable. This case vividly illustrates the risk of an inconsistent verdict if the jury is asked to answer "yes" or "no" separately as to each of the three statutory

---

[6] Both parties seek to avoid a new trial on punitive damages, and both argue that the verdict is not inconsistent. Rather than analyze the issue, the majority opinion simply defers to that agreement. This court, however, is not bound by the agreement of counsel and can reach its own conclusion notwithstanding counsel's argument to the contrary. If the parties' legal argument is contrary to law, the fact that they agree on the issue does not make their argument any more compelling. Nor, in light of our letter to the parties expanding the issues to be briefed, does it remove the issue from the case.

[7] None of the cases so holding, however, involve an express finding by the jury of "no malice" and thus presented no issue of potential conflict.

5

grounds, and serves as a reminder that instead a single question should be presented in the disjunctive so as to avoid such risk (see CACI VF-3900 et seq.). The majority opinion concurs in this conclusion. (Maj. opn., p. 13, fn. 2.)

c.      *A New Trial Is Not Required*

An appellate court cannot choose between inconsistent findings. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc., supra,* 126 Cal.App.4th at p. 682.) Several opinions state the general rule that the proper remedy for an inconsistent special verdict is a reversal for a new trial. (E.g., *Singh*, *supra*, 186 Cal.App.4th at p. 358; *Stillwell v. Salvation Army* (2008) 167 Cal.App.4th 360, 376; *Shaw v. Hughes Aircraft Co., supra,* 83 Cal.App.4th at p. 1344.) The general rule is appropriate when the evidence could support either of the contradictory findings on a material issue.

In my view, however, an exception to the general rule should apply if the reviewing court decides as a matter of law that the evidence reasonably can support only one conclusion on the issue that is the subject of the inconsistent findings. In so deciding, a reviewing court does not rely on or credit any of the jury's inconsistent findings and does not offend the general rule. It is therefore necessary to address Stonebridge's contention that the evidence does not support the jury's finding that Stonebridge acted with fraud, despite my conclusion that the verdict is inconsistent. As explained below, I believe that there is no substantial evidence to support the fraud finding and therefore conclude that Stonebridge is entitled to have the award of punitive damages stricken from the judgment.

2.      *The Evidence Is Insufficient to Support the Fraud Finding*

Stonebridge contends there is no substantial evidence that it intentionally misrepresented or concealed a material fact and therefore there is no substantial evidence to support the fraud finding. Stonebridge does not challenge the finding that it had no reasonable basis for denying full payment on Nickerson's claim, but argues that it committed no fraud in connection with that denial. Quite apart from the jury's express

6

finding that Stonebridge did not do any act that was intended to cause harm to Nickerson (i.e., no malice), I can find no sufficient evidentiary basis for the fraud finding.[8]

A reviewing court reviews the sufficiency of the evidence to support a factual finding under the substantial evidence standard. Substantial evidence is evidence that a rational trier of fact could find to be reasonable, credible and of solid value. We view the evidence in the light most favorable to the judgment and accept as true all evidence tending to support the judgment, including all facts that reasonably can be deduced from the evidence. The evidence is sufficient to support the factual finding only if an examination of the entire record viewed in this light discloses substantial evidence to support the factual finding. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429; *Mealy v. B-Mobile, Inc.* (2011) 195 Cal.App.4th 1218, 1223.)

Nickerson's counsel stated in closing argument that Stonebridge acted with fraud by stating in the letter dated October 10, 2008, that "an <u>acute</u> care setting" was not needed after February 28, 2008. He argued that the policy coverage was not limited to hospitalization for acute care and that the statement in the letter was a misrepresentation of fact. He also argued that the statement in the letter that confinement was not provided in the most economically and medically appropriate site for treatment after March 1, 2008, was a misrepresentation of fact because Nickerson could not afford to go anywhere else for treatment. Finally, he argued that the letter stated that the treatment provided was not consistent with professionally recognized standards of care, and argued that this

---

[8]     The majority relies on the fraud finding not only to justify an award of punitive damages, but also to support its conclusion that Stonebridge's conduct was so reprehensible as to support an award of punitive damages 10 times the amount of the compensatory award.

7

statement also was a misrepresentation of fact.[9]  In my view, there is no substantial evidence of fraud on any of these grounds.[10]

Stonebridge's letter dated October 10, 2008, stated that Dr. Ngyuen's letter did not change its decision because Dr. Nguyen did not indicate that hospitalization in an "<u>acute</u> care setting" was required as of March 1, 2008.  The October 10 letter also stated, in relevant part:  "Your certificate provides benefits for confinement that is Necessary Treatment.  Your certificate states in part that in order for confinement to be Necessary treatment it must be 1.) medically necessary; and 2.) consistent with professionally recognized standards of care with respect to quality, frequency, and duration; and 3.) provided in the most economically and medically appropriate site for treatment."  Thus, the letter accurately set forth the policy limitations regarding necessary treatment and did not misrepresent the facts in this regard.

I believe the only reasonable construction that can be placed on the reference in the letter to "an <u>acute</u> care setting" is that it meant a hospital, as distinguished from a convalescent or nursing care facility.  The letter stated that "[Nickerson's] confinement in an acute care setting," meaning his hospital confinement, was not medically necessary as of March 1, 2008, so he was not entitled to hospital confinement benefits under the policy on or after that date.  In my view, as a matter of law, there was no

---

[9]     Nickerson's counsel argued:  "How dare they say that this VA Hospital who treats veterans, and Dr. Nguyen who treats spinal cord patients—you heard his testimony—that treatment was not consistent with professionally recognized standards of care.  Wow.  Wow.  They're basically accusing this doctor and the VA Hospital of keeping somebody in the hospital longer than medically necessary.  I can't believe it, couldn't believe it when I took the case; still can't believe it -- it's reprehensible, vile, contemptible—it's anything you want to call it.  Where does this defendant get off accusing the doctor and hospital of being unprofessional, recognizing standards of care lower than that just so they can save $31,500.  You can't put a corporation in jail, but you can punish them, and that's what the second case is about, punitive damages."

[10]     Significantly, Nickerson does not argue on appeal in support of any of these grounds for the fraud finding.  Instead, he asserts other grounds for that finding, as discussed *post*.

8

misrepresentation of fact in this regard and no substantial evidence that Stonebridge intentionally misrepresented the coverage limitation with the intention of denying policy benefits.

My conclusion is the same with respect to the statements in the letter that Nickerson's confinement on and after March 1, 2008, was not provided in the most economically and medically appropriate site for treatment and was not consistent with professionally recognized standards of care. Although Nickerson may argue that the treatment site must be economically appropriate from his perspective, rather than from the perspective of a third-party payor, the statements in the letter, are in no manner misrepresentations of fact simply because they are based on a different, and more reasonable, understanding of the policy terms.

Nickerson argues on appeal three alternative factual bases for the fraud finding. First, he argues that Stonebridge intentionally concealed a material fact by burying a coverage limitation, the "necessary treatment" limitation, deep in the definitions section of the policy. The trial court found, as a matter of law, that the "necessary treatment" limitation was not conspicuous, plain and clear and therefore was unenforceable (see *Haynes v. Farmers Ins. Exchange* (2004) 32 Cal.4th 1198, 1204 (*Haynes*)), and so instructed the jury. Stonebridge does not challenge that finding on appeal. But the "necessary treatment" limitation *was* expressly stated in the policy, and the policy was provided to Nickerson at the time it was issued. He testified that he received a copy of the policy and read it at the time, *including the definitions section and specifically the definition of "necessary treatment."* Thus, it is beyond reasonable dispute that the provision, although the court found that it was inconspicuous, was *not* concealed.

The question whether a coverage limitation was conspicuous, plain and clear is a question of law for the court to decide. (*Haynes*, *supra,* 32 Cal.4th at p. 1204.) If the jury, based only on the court's determination that a coverage limitation was not conspicuous, plain and clear, could conclude that the insurer had thereby intentionally concealed a coverage limitation, punitive damages would follow almost as a matter of

9

course in every case of insurance bad faith where the trial court ruled that an exclusion did not satisfy the requirements set out in *Haynes*.

Second, Nickerson argues that Stonebridge had concealed a material fact by failing to ensure that a peer reviewer would communicate by phone with the treating physician. The evidence that Stonebridge did not check the box so as to require the peer reviewer in this case to communicate with the treating physician, and typically did not do so in other cases, is insufficient to support a reasonable inference that it acted with the intention of concealing relevant information so as to wrongfully deprive Nickerson of policy coverage. There is no indication in the record that such communication was necessary for a competent peer review, that the failure to check the box prevented the peer reviewer from communicating with the treating physician if appropriate or that Stonebridge intentionally concealed any information in this regard with the intention of denying policy benefits.[11] I therefore conclude that there is no substantial evidence of either an intentional concealment or an intent to injure based on the failure to check the box.

Finally, Nickerson argues that Stonebridge concealed a material fact by failing to provide the peer reviewer with Dr. Nguyen's letter explaining the reasons for Nickerson's continued hospitalization. Hammer testified, and the evidence clearly shows beyond any dispute, that the letter contained no information about Nickerson's medical condition that was not already included in records previously provided to the peer reviewer. She stated that the only new information in the letter was that Nickerson could not navigate the

---

[11]    The majority opinion accurately states, "[t]he case review submittal form included a box to check if Stonebridge *required* a phone consultation between the peer reviewer and the treating physician." (Maj. opn., p. 6, italics added.) But the majority later characterizes a checked box as "authorizing" or "allowing" such communication and states, apparently based on the form alone, that the failure to check the box "precludes contact" and "obstruct[s] unfettered communication between the treating physician and the reviewer." (*Id.* at pp. 20-21.) Contrary to the majority opinion, I can find no evidentiary support for these statements. To the contrary, the uncontroverted testimony of Stonebridge's claims representative Amy Hammer was that Stonebridge had no policy preventing such communication.

10

narrow doorways in his home alone without a caregiver, and she stated that the policy provided no coverage for convalescent care. Nickerson does not argue to the contrary, but contends instead that the jury was not required to believe Hammer's testimony and that the information in the letter concerning his inability to navigate his home in a wheelchair while his leg was fully extended in a Long Beach splint was relevant. In my view, the relevance of that information was marginal at best in light of the "necessary treatment" limitation in the policy, which had not been judicially declared unenforceable at time of the coverage decision. In my view, the evidence, viewed in the light most favorable to the judgment, is clearly insufficient to support a finding of either an intentional concealment of a material fact or an intent to injure based on the failure to provide Dr. Nguyen's letter to the peer reviewer.

3.    *Stonebridge Is Entitled to Have The Punitive Damage Award Stricken From the Judgment*

"An appellate court may reverse a judgment with directions to enter a different judgment if it appears from the record that no new evidence of significance would be presented in a new trial and there is only one proper judgment. [Citations.]" (*Singh, supra*, 186 Cal.App.4th at p. 357.) The punitive damages issue was thoroughly litigated at trial, and Nickerson concedes that there is no need for a retrial on punitive damages if the court decides that there is no substantial evidence of oppression, fraud or malice in the present record.[12] In my view, the only possible reasonable conclusion is that Stonebridge is entitled to a judgment awarding no punitive damages. I would therefore reverse the order granting a partial new trial on punitive damages and modify the judgment to award no punitive damages.

---

[12]    Nickerson does not separately discuss "oppression" or "malice" and does not argue that if the evidence does not support the finding of fraud he should be afforded an opportunity to prove in a new trial that Stonebridge was guilty of oppression or malice.

In light of that conclusion, there is no need to address the parties' other contentions, and I would dismiss as moot Stonebridge's appeal from the denial of its motion for judgment notwithstanding the verdict.


CROSKEY, J.