Filed 4/7/21 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROSARIO CONTRERAS-VELAZQUEZ, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> FAMILY HEALTH CENTERS OF SAN DIEGO, INC., <br><br> Defendant and Appellant. | D075577 <br><br><br> (Super. Ct. No. 37-2014-00026469-CU-WT-CTL) <br><br> ORDER MODIFYING OPINION AND DENYING REHEARING <br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on March 18, 2021, be modified as follows:

1.     On page 13, line 4, the sentence commencing with "Because the entire" and ending with "preclusion doctrine" is modified to read as follows:

> Because the entire judgment entered on the first jury's special verdict was vacated and held in abeyance, the first jury's ability-to-perform findings were not final when Family Health tried to invoke the issue preclusion doctrine.

2.     On page 13, the first sentence of the first full paragraph is modified to read as follows:

> Family Health asserts three arguments concerning the alleged finality of the first jury's ability-to-perform findings.

3.     On page 16, the third paragraph is modified to read as follows:

Given the absence of finality, the trial court properly declined to apply issue preclusion to the first jury's ability-to-perform findings.

There is no change in the judgment.

The petition for rehearing is denied.

McCONNELL, P. J.

Copies to:  All parties

2

Filed 3/18/21 (unmodified opinion)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ROSARIO CONTRERAS-VELAZQUEZ, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> FAMILY HEALTH CENTERS OF SAN DIEGO, INC., <br><br> Defendant and Appellant. | D075577 <br><br><br> (Super. Ct. No. 37-2014-00026469-CU-WT-CTL) |

APPEALS from a judgment and a postjudgment order of the Superior Court of San Diego County, Jeffrey B. Barton, Judge. Affirmed.

Mulvaney Barry Beatty Linn & Mayers, John A. Mayers, Patrick L. Prindle; Law Offices of Mary A. Lehman and Mary A. Lehman, for Defendant and Appellant.

Law Office of Martin N. Buchanan, Martin N. Buchanan; Hogue & Belong, Jeffrey L. Hogue and Tyler Belong, for Plaintiff and Appellant.

I

INTRODUCTION

Rosario Contreras-Velazquez (Velazquez) sued her former employer, Family Health Centers of San Diego, Inc. (Family Health), alleging disability

discrimination and related causes of action after she suffered a work-related injury and Family Health terminated her employment. A jury found Family Health not liable, but the trial court ordered a new trial as to three of Velazquez's causes of action after finding the evidence was insufficient to support the jury's verdict—a ruling we affirmed in a prior appeal. (*Contreras-Velazquez v. Family Health Centers of San Diego, Inc.* (Aug. 9, 2017, D071083) [nonpub. opn.] (hereafter, *Velazquez I*).)

At the ensuing retrial, a jury found in favor of Velazquez. The jury awarded her $915,645 in compensatory damages and $5 million in punitive damages. However, the trial court granted in part a motion for judgment notwithstanding the verdict (JNOV) and reduced the punitive damages award to $1,831,290 (a 2:1 ratio of punitive to compensatory damages). The court reasoned a punitive damages award equal to twice the compensatory damages award was the maximum amount permissible under the due process clause of the Fourteenth Amendment to the United States Constitution.

Family Health appeals the judgment and contends certain special verdict findings returned by the first jury estopped Velazquez from prevailing at the retrial under the issue preclusion doctrine. Family Health also appeals the JNOV order on the basis that the reduced punitive damages award remains grossly excessive in violation of Family Health's due process rights. Family Health requests the punitive damages award be further reduced to $915,645 (a 1:1 ratio of punitive to compensatory damages). Velazquez cross-appeals the JNOV order and requests reinstatement of the $5 million punitive damages award.

We conclude the first jury's special verdict findings did not constitute a final adjudication of any issue and, therefore, the trial court correctly ruled that the issue preclusion doctrine did not require entry of judgment in Family

2

Health's favor.  Further, we conclude the trial court properly reduced the punitive damages award to an amount equal to twice the compensatory damages award—and no further.  Therefore, we affirm both the judgment and the JNOV order.

## II

## BACKGROUND

### A

### *Velazquez's Termination*

From 2003 to 2006, Velazquez worked as a medical records clerk and a patient service representative for Family Health, a non-profit organization that operates community health clinics.  She stopped working for Family Health in 2006, but was rehired to Family Health's medical records department in 2008.

In 2012, Velazquez suffered a work-related repetitive stress injury to her right upper arm.  She underwent surgery to treat the injury, but the surgery was not effective.

Velazquez returned to work after her surgery and, in December 2013, was transferred to Family Health's call center to work as an appointment technician.  In her new position, Velazquez was required to use a headset and a computer mouse repetitively for approximately 6–8 hours per day.  Family Center provided Velazquez a right-handed computer mouse and a pull-out tray for her mouse situated on the right side of her desk.

Within days of beginning her new position, Velazquez experienced pain in her right arm.  She told her supervisor about her condition and requested an accommodation such as a left-handed mouse or a roller mouse.  Family Health provided Velazquez a roller mouse, but it did not function properly.  A week and a half after Velazquez began her new position, Velazquez's

3

supervisor instructed her to stop coming into work, schedule an appointment with her doctor, and provide a doctor's report before returning to work.

The next day, Velazquez saw her doctor, who prepared a report indicating Velazquez complained of pain on both sides, did not feel able to do her usual job duties, and wanted to be taken completely off work because of significant discomfort. Nonetheless, the report indicated she could return to modified work with four restrictions: (1) "Limited use of right upper extremity"; (2) "Repetitive hand, wrist and keyboard work limited to 10 minutes per hour"; (3) "No overhead lifting or reaching with the right upper extremity"; and (4) "No forceful pushing and pulling with the right upper extremity." The report stated Velazquez was "eventually going to wind up with some fairly profound limitations in the long run" and Family Health should contact her doctor to discuss her work status because "whatever they have her doing at work is just aggravating everything, which is going to be to nobody's advantage."

A few days after the doctor's visit, Velazquez provided the doctor's report to her supervisor and spoke with a human resources representative regarding her injury. The human resources representative instructed Velazquez to refrain from coming into work and to continue seeing her doctor. For the next three months, Velazquez did not come into work per her instructions. She visited her doctor once per month and provided Family Health a doctor's report after each visit.

Family Health did not contact Velazquez's doctor to discuss possible work arrangements to accommodate her injury. However, one of Family Health's human resources representatives searched online for employment positions that were available and suitable for Velazquez given her

4

qualifications and work restrictions.  She was unable to identify a position appropriate for Velazquez.

Family Health terminated Velazquez's employment in April 2014.  In two separate conversations, Velazquez told one of Family Health's human resources representatives she wanted to remain employed and asked whether there were any job positions available for her.  The human resources representative stated Family Health could not accommodate Velazquez's disability and could no longer employ her.

B

*The First Trial*

Velazquez sued Family Health alleging six causes of action under the Fair Employment and Housing Act (FEHA):  disparate treatment based on physical disability (Gov. Code, § 12940, subd. (a)); failure to accommodate physical disability (*id.*, § 12940, subd. (m)); failure to engage in the interactive process (*id.*, § 12940, subd. (n)); hostile work environment (*id.*, § 12940, subd. (j)); retaliation (*id.*, § 12940, subd. (h)); and failure to prevent discrimination (*id.*, § 12940, subd. (k)); as well as a cause of action for wrongful termination in violation of public policy.

The case proceeded to a jury trial resulting in a verdict in favor of Family Health on all seven causes of action.  For the disparate treatment and failure to accommodate causes of action, the jury returned special verdict findings that Velazquez was unable to perform essential job duties with reasonable accommodation for her physical disability.  For the interactive process cause of action, the jury returned a special verdict finding that Family Health did not fail to participate in a timely, good-faith interactive process with Velazquez to determine whether a reasonable accommodation could be made.  For the failure to prevent discrimination cause of action, the

5

jury returned a special verdict finding that Family Health did not fail to take all reasonable steps to prevent discrimination. The jury found Family Health not liable on the remaining causes of action for reasons not pertinent to this appeal.

After the court entered judgment in favor of Family Health, Velazquez moved for a new trial on grounds that the evidence was insufficient to justify the verdict. In her motion, she did not limit the scope of her request for a new trial; therefore, she presumably sought a new trial as to all seven causes of action. However, in a supplemental brief filed with the court's permission, Velazquez limited the scope of her new trial request to three causes of action—the FEHA causes of action for failure to accommodate, failure to engage in the interactive process, and failure to prevent discrimination.

The court granted the motion for a new trial as limited by Velazquez in her supplemental brief. The new trial order stated in relevant part as follows: "It is not only the right, but the duty of the trial court to grant a new trial when, in its opinion, the court believes the weight of the evidence to be contrary to the finding of the jury. [Citation.] [¶] [Velazquez] has met her burden on this motion. [¶] The weight of the evidence in this case was that (1) [Family Health] failed to participate in a timely, good faith interactive process with [Velazquez] to determine whether reasonable accommodation could be made; (2) [Velazquez] was able to perform essential job duties with reasonable accommodation for the physical disability; and (3) [Family Health] failed to provide reasonable accommodation for [Velazquez]." Based on these findings, the court ordered a new trial for the failure to accommodate, failure to engage in the interactive process, and failure to prevent discrimination causes of action.

C

*The First Appeal*

Family Health appealed the order granting a partial new trial. It argued among other things that substantial evidence did not support the trial court's reasons for granting a new trial.

We rejected Family Health's sufficiency of the evidence argument and affirmed the partial new trial order. (*Velazquez I, supra*, D071083.) In relevant part, we concluded as follows:

> "The [trial] court found the weight of the evidence showed Velazquez was qualified for and could perform the appointment technician position with reasonable accommodation…. There is substantial evidence to support the [trial] court's determination.

[¶] . . . [¶]

> "Regarding the existence of a reasonable accommodation, the evidence showed Velazquez could perform the job with her left hand if she had an operational roller mouse. [Citation.] Family Health provided her with a defective roller mouse and, when Velazquez pointed this out to Family Health, Family Health indicated it would try to get her a new mouse, but there is no evidence it did so….

> "Regarding Family Health's engagement in the interactive process, the evidence shows Family Health engaged in the process until Velazquez aggravated her injury working as an appointment technician. At that point, Family Health believed no further accommodations for the appointment technician position could reasonably and effectively be made because Family Health mistakenly believed Velazquez was restricted from using both of her hands repetitively. [Citation.] Family Health based its mistaken belief on limitations specified in admittedly vague doctor's reports, the import of which Family Health did not attempt to clarify with Velazquez's doctor despite language in one of the reports inviting a conversation between the doctor and Family Health to discuss Velazquez's limitations.

[¶] . . . [¶]

7

"As there is substantial evidence to support the [trial] court's reasons for granting a new trial, we conclude the court did not abuse its discretion in doing so.  We, therefore, affirm the order."

(*Velazquez I, supra*, D071083.)

D

*The Retrial*

On remand, Family Health moved for summary judgment on grounds that issue preclusion foreclosed Velazquez from prevailing on any of the three causes of action that were the subject of the partial new trial order.  Family Health asserted that all three causes of action required Velazquez to show that she was able to perform her essential job duties with reasonable accommodation for her disability.  According to Family Health, the first jury resolved this issue against Velazquez when it returned its special verdict finding Family Health not liable for disparate treatment based on physical disability.  As noted, Velazquez did not pursue—and the trial court did not grant—a new trial for Velazquez's disparate treatment cause of action.

The trial court denied Family Health's motion for summary judgment, reasoning as follows:  "The issue of whether Plaintiff could have performed her essential job duties with reasonable accommodation as it related to the three causes of action remaining has not been finally adjudicated and collateral estoppel, therefore, does not bar [Velazquez] from proceeding on the three pending causes of action."  The court added that it "saw no persuasive authority to support [Family Health's] position … that because a trial court granted a new trial on less than all the causes of action (thereby simply reducing [Velazquez's] claims) that [Velazquez] nevertheless had to proceed to overturn the jury's findings as to any cause of action containing a common element."

8

Family Health repeated its issue preclusion argument in a pretrial motion in limine and a motion for judgment on the pleadings. The court denied the motion in limine without elaboration. It is not apparent from the appellate record whether the trial court adjudicated Family Health's motion for judgment on the pleadings.[1]

At the retrial, a jury found in favor of Velazquez on all three causes of action. It awarded Velazquez $915,645 in compensatory damages consisting of $115,645 for past economic loss, $50,000 for future economic loss, $450,000 for past non-economic loss, and $300,000 for future non-economic loss. It also returned a special verdict finding Family Health engaged in conduct with malice, oppression, or fraud. Following a bifurcated trial on the issue of punitive damages, the jury awarded Velazquez $5 million in punitive damages. The court entered judgment in favor of Velazquez in the amount of $5,915,645.

Thereafter, Family Health filed a motion for JNOV arguing, among other things, that the punitive damages award was grossly excessive in violation of Family Health's due process rights. The court granted the motion in part. It found, on the one hand, that Family Health's conduct "appear[ed] to be the product of neglect as opposed to intentional malice," the compensatory damages award was "substantial," and the award for noneconomic damages appeared to contain a "punitive element," factors that weighed in favor of a reduced punitive damages award. It found, on the other hand, that Family Health's conduct was at least moderately reprehensible because it caused Velazquez physical harm in the form of emotional distress, Velazquez was financially vulnerable, and Family Health engaged in a

---

[1] Family Health states without record support that the trial court denied its motion for judgment on the pleadings.

9

"course of conduct showing a conscious disregard [for] the health, safety and rights of [Velazquez]," factors that weighed against a reduction of the punitive damages award. Based on these findings, the court determined a 2:1 ratio of punitive to compensatory damages was the maximum constitutionally-permissible ratio for any punitive damages award. It therefore reduced the punitive damages award from $5 million to $1,831,290.

The court subsequently awarded Velazquez attorney fees and costs totaling approximately $1.1 million.

III

DISCUSSION

A

*Issue Preclusion Did Not Require Entry of Judgment in
Favor of Family Health*[2]

Family Health contends the trial court erred in declining to give preclusive effect to the findings of the first jury—which it returned as part of its special verdict on Velazquez's disparate treatment cause of action—that Velazquez was not able to perform the essential duties of her job with reasonable accommodation for her disability. According to Family Health, this ability-to-perform issue was an essential element of all three of the causes of action in the retrial. Family Health asserts the issue preclusion doctrine, properly applied as to the ability-to-perform issue, required the trial court to enter judgment in Family Health's favor as to all three of the causes of action for which a new trial was ordered.

---

[2]     The terms "issue preclusion" and "collateral estoppel" are sometimes used interchangeably. The Supreme Court "use[s] 'issue preclusion' in place of 'direct or collateral estoppel[.]' " (*Samara v. Matar* (2018) 5 Cal.5th 322, 326.) We will follow the Supreme Court's lead and use the term "issue preclusion" to refer to the preclusion doctrine under discussion here.

10

Velazquez asserts Family Health waived or forfeited its issue preclusion argument by failing to raise it in the *Velazquez I* appeal.[3] To the extent the argument is adequately preserved, Velazquez contends the argument is meritless because the first jury did not finally adjudicate Velazquez's ability to perform, issue preclusion does not apply to proceedings in the same litigation, the ability-to-perform issue was not an essential element of all three causes of action in the retrial, and the public policies underpinning the equitable issue preclusion doctrine did not support the application of issue preclusion in this case.

1

*Legal Principles*

Issue preclusion "precludes relitigation of issues argued and decided in prior proceedings. [Citation.] Traditionally, we have applied the doctrine only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]' " (*Hernandez v. City of Pomona* (2009) 46 Cal.4th 501, 511.)

"Besides the classic five criteria for applicability, '[t]here is an equitable component to [issue preclusion]' as well. [Citation.] ' "[E]ven where the

---

[3]    In connection with this argument, Velazquez seeks judicial notice of appellate briefing and the appellate docket from the *Velazquez I* appeal. Because we conclude Family Health's collateral estoppel argument fails on the merits, we deny the request for judicial notice as unnecessary to the disposition of this appeal.

technical requirements are all met, the doctrine is to be applied 'only where such application comports with fairness and sound public policy.' " ' " (*Union Pacific Railroad Co. v. Santa Fe Pacific Pipelines, Inc.* (2014) 231 Cal.App.4th 134, 185.)  Thus, a court must consider whether application of the issue preclusion doctrine would comport with the doctrine's core policies, namely the preservation of the integrity of the judicial system, the promotion of judicial economy, and the protection of litigants from harassment by vexatious litigation.  (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 343 (*Lucido*).)

2

*Application*

Velazquez asserts several arguments as to why issue preclusion did not bar her causes of action in the retrial.  We do not address all of Velazquez's arguments because one will suffice:  the first jury's findings concerning Velazquez's ability to perform was not preclusive because it was not *final*.

After the first jury returned its verdict and the trial court entered judgment in Family Health's favor, the court granted a partial new trial as to three causes of action.  "When [the] court grant[ed] [the] partial new trial, 'the new trial order ha[d] the effect of vacating the entire judgment and holding in abeyance the portions which [were] not subject to a new trial until one final judgment [could] be entered.' " (*Newstart Real Estate Investment LLC v. Huang* (2019) 37 Cal.App.5th 159, 163–164, quoting *Beavers v. Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 329 (*Beavers*).)  Thus, "there was no final judgment; it was vacated by operation of law" when the trial court granted the partial new trial.  (*Newstart*, at p. 164; see *Ferraro v. Pacific Finance Corp.* (1970) 8 Cal.App.3d 339, 345 [an "order granting a limited new trial ha[s] the effect of vacating the earlier judgment."].)  And, our

12

subsequent affirmance of the partial new trial order guaranteed that "the underlying judgment [was] '*absolutely vacated.*' " (*Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 304 (*Keck*), italics added.) Because the entire judgment entered on the first jury's special verdict was vacated and held in abeyance, the first jury's ability-to-pay findings were not final when Family Health tried to invoke the issue preclusion doctrine.

Family Health asserts three arguments concerning the alleged finality of the first jury's ability-to-pay findings. First, it argues an aggrieved party can always appeal a portion of a judgment unaffected by a partial new trial order; therefore, Family Health claims the first jury's ability-to-perform findings became final when Velazquez did not appeal the judgment entered on the first jury's verdict. In support of this argument, Family Health cites language from two decisions, *Baker v. American Horticulture Supply, Inc.* (2010) 186 Cal.App.4th 1059 (*Baker*) and *Prichard v. Liberty Mutual Ins. Co.* (2000) 84 Cal.App.4th 890 (*Prichard*), suggesting a party can "attack even those parts of [a] judgment that [are] not subject to [a] new trial order" on appeal after an order granting a partial new trial. (*Prichard*, at p. 901; see *Baker*, at p. 1071, fn. 5.) We are not persuaded.

The *Baker* and *Prichard* decisions both cite another decision, *Beavers, supra*, 225 Cal.App.3d 310, for the proposition that a party can challenge on appeal the parts of a judgment not subject to a partial new trial order. (*Prichard, supra*, 84 Cal.App.4th at p. 901; *Baker, supra*, 186 Cal.App.4th at p. 1071, fn. 5.) In *Beavers*, the court articulated the general rule, discussed above, "that a partial new trial order vacates and holds in abeyance the entire judgment." (*Beavers*, at p. 330.) It then recognized an exception to the general rule, stating that " 'when an appeal is taken from [a new trial] order the vacating effect is suspended, and the judgment remains effective for the

13

purpose of an appeal from the judgment.' " (*Ibid.*, quoting *Spencer v. Nelson* (1947) 30 Cal.2d 162, 164.) *Baker* and *Prichard* cite the *Beavers* exception without further elaboration. (*Prichard*, at p. 901; *Baker*, at p. 1071, fn. 5.)

The exception referenced in *Beavers* merely stands for the proposition that a protective cross-appeal may be filed by a party whose motion for a new trial has been granted. (*Keck, supra*, 232 Cal.App.4th at p. 304.) "The cross-appeal is 'protective' because it ensures the right to obtain appellate review of the judgment if the order granting a new trial is reversed. [Citations.] [¶] 'The cross-appeal from the judgment is only operative if the order granting the new trial is reversed thus reinstating the judgment.' [Citation.] 'The reviewing court will first consider the main appeal from the order granting a new trial and will decide the cross-appeal from the judgment only if it reverses the order. [Citations.] But if, as is usual, the order granting a new trial is affirmed, the effect is that there is no longer a final judgment." (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 798–799.)

As this court has recognized, the availability of a protective cross-appeal does not—as the *Baker* and *Prichard* decisions might be read to suggest—supplant "the 'settled' rule … that where a reviewing court *affirms* an order granting a partial new trial, issues that are unrelated to the new trial order must await review in an appeal from the final judgment." (*Keck, supra*, 232 Cal.App.4th at p. 305, italics added.) Pursuant to this settled rule, we reject Family Health's claim that a party can always seek immediate review of any portion of a judgment unaffected by a partial new trial order.

Next, Family Health argues that even if a partial new trial order may vacate the entire judgment in some circumstances, it does not (or should not) vacate the entire judgment in other circumstances—where, as here, the new trial order mandates a retrial for some causes of action and does not require a

14

retrial for other causes of action. Under this theory, Family Health contends a portion of the underlying judgment—the portion finding Family Health not liable as to certain causes of action—was left untouched by the partial new trial order and became final when Velazquez did not appeal the judgment entered on the first jury's verdict.

Family Health's argument reflects a misunderstanding concerning the reason why the entire judgment is vacated when a partial new trial is ordered. When a new trial is granted in part, the entire judgment is vacated so as to avoid a possible violation of the one final judgment rule. (*Beavers, supra,* 225 Cal.App.3d at p. 329; *Love v. Wolf* (1967) 249 Cal.App.2d 822, 840.) Vacatur of the entire judgment guarantees that if a partial new trial order is affirmed, " 'there will be no final judgment until the [re]trial … ends …..' " (*Beavers,* at p. 329.) "Were the rule otherwise, two appealable judgments would be entered in violation of the one judgment rule." (*Ibid.*)

That is precisely the problematic outcome that would occur here if we were to adopt Family Health's novel argument. Under Family Health's theory, it would be acceptable for one judgment to be entered as to a subset of Velazquez's causes of action and a second judgment to be entered (after affirmance of the partial new trial order and the retrial) as to her remaining causes of action. This would violate the one final judgment rule, which states that " ' "an appeal may be taken only from the final judgment in an entire action." ' " (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 756; see *Kurwa v. Kislinger* (2013) 57 Cal.4th 1097, 1107 ["The one final judgment rule does not permit parties 'to separate [their] causes of action into two compartments for separate appellate treatment at different points in time.' "].) Thus, we decline to adopt Family Health's theory of appealability.

15

Finally, Family Health contends the first jury's special verdict findings were sufficiently final even if Velazquez did not yet have an opportunity to appeal them. There is no merit to this claim. An adjudication is final for issue preclusion purposes if it is "free from direct attack …." (*Lucido, supra*, 51 Cal.3d at p. 342; *Mueller v. J.C. Penney Co.* (1985) 173 Cal.App.3d 713, 719 ["For purposes of [issue preclusion], a judgment free from direct attack is a final judgment."].) An adjudication is not final "if an appeal is pending or could still be taken." (*Riverside County Transportation Com. v. Southern California Gas Co.* (2020) 54 Cal.App.5th 823, 838; *People v. Burns* (2011) 198 Cal.App.4th 726, 731 ["the judgment is not final and preclusive if it is still subject to direct attack"].)

Here, the first jury's special verdict findings remained vulnerable to direct attack at the time Family Health tried to invoke collateral estoppel because Velazquez still could have challenged the findings on appeal from the final judgment after the retrial. Because an appeal of the first jury's findings was still possible when Family Health sought to invoke collateral estoppel, the jury's findings were not a final adjudication entitled to a preclusive effect.

Given the absence of finality, the trial court properly declined to apply issue preclusion to the first jury's ability-to-pay findings.[4]

B

*The Reduction to the Punitive Damages Award was Proper*

Family Health also appeals the partial JNOV order reducing the punitive damages award from $5 million to $1,831,290 (a 2:1 ratio of punitive

---

[4] Family Health claims for the first time in its reply brief that the first and second juries' verdicts are irreconcilable. Because Family Health failed to raise its inconsistent verdicts argument in its opening brief, the argument is forfeited. (*High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 111, fn. 2.)

16

to compensatory damages).  It contends any punitive damages award exceeding $915,645 (a 1:1 ratio of punitive to compensatory damages) violates its federal due process rights.

Velazquez cross-appeals the partial JNOV order and asserts the jury's original punitive damages award of $5 million (a 5.46:1 ratio of punitive to compensatory damages) was constitutionally permissible.  On this basis, Velazquez seeks reinstatement of the original $5 million punitive damages award.

1

*Legal Principles*

"In our judicial system, '[a]lthough compensatory damages and punitive damages are typically awarded at the same time by the same decisionmaker, they serve distinct purposes.  The former are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct.  [Citations.]  The latter ... operate as "private fines" intended to punish the defendant and to deter future wrongdoing.' " (*Nickerson v. Stonebridge Life Ins. Co.* (2016) 63 Cal.4th 363, 371 (*Nickerson I*); *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003) 538 U.S. 408, 416 (*State Farm*) [" 'Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition' "].)

"States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." (*BMW of N. Am., Inc. v. Gore* (1996) 517 U.S. 559, 568 (*Gore*).)  However, "[t]he due process clause of the Fourteenth Amendment to the United States Constitution places constraints on state court awards of punitive damages." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 712 (*Roby*).)  In particular, due process prohibits the imposition

17

of grossly excessive or arbitrary punitive damages awards, " 'for due process entitles a tortfeasor to " 'fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.' " ' [Citation.]" (*Roby*, at p. 712.)

The U.S. Supreme Court has articulated "a set of substantive guideposts that reviewing courts must consider in evaluating the size of punitive damages awards: '(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.' " (*Nickerson I, supra*, 63 Cal.4th at pp. 371–372, quoting *State Farm, supra*, 538 U.S. at p. 418.)

"A trial court conducts this inquiry in the first instance; its application of the factors is subject to de novo review on appeal." (*Nickerson I, supra*, 63 Cal.4th at p. 372.) "This '[e]xacting appellate review' is intended to ensure punitive damages are the product of the ' " 'application of law, rather than a decisionmaker's caprice.' " ' " (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172 (*Simon*).) "[F]indings of historical fact made in the trial court are still entitled to the ordinary measure of appellate deference" and form the basis for a reviewing court's punitive damage analysis so long as substantial evidence supports the trial court's findings. (*Ibid.*)

18

## 2

### *Application*

#### *i*

#### *Reprehensibility*

Of the three guideposts articulated by the U.S. Supreme Court, "the most important is the degree of reprehensibility of the defendant's conduct." (*Roby, supra*, 47 Cal.4th at p. 713; see *State Farm, supra*, 538 U.S. at p. 418.) In assessing reprehensibility, we must consider the following five factors: "whether '[1] the harm caused was physical as opposed to economic; [2] the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; [3] the target of the conduct had financial vulnerability; [4] the conduct involved repeated actions or was an isolated incident; and [5] the harm was the result of intentional malice, trickery, or deceit, or mere accident.' " (*Roby*, at p. 713, quoting *State Farm*, at p. 419.)

The first reprehensibility factor is present here because, as the trial court found, Family Health's conduct caused Velazquez physical harm in the form of emotional and mental distress. (See *Roby, supra*, 47 Cal.4th at p. 713; *Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521, 559 (*Tilkey*) ["Harm is physical when it affects emotional and mental health and is not purely economic."].) Witnesses testified Velazquez suffered depression, anxiety, sleep loss, and suicidal thoughts due to the termination of her employment and the resulting financial insecurity she experienced. Further, Velazquez claimed noneconomic damages for mental suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, and emotional distress, and the jury awarded her $750,000 in noneconomic damages. Under these circumstances, the first reprehensibility factor weighs in favor of an aggravated punitive damages award.

19

The second reprehensibility factor is present as well. Family Health reasonably could have foreseen its discriminatory conduct "would affect [Velazquez's] emotional well–being, and therefore [its] 'conduct evinced an indifference to or a reckless disregard of the health or safety of others.' " (*Roby, supra*, 47 Cal.4th at p. 713.) Velazquez was a physically-disabled, middle-aged immigrant who did not have a college degree. After Family Health told her of its decision to terminate her employment, she literally begged Family Health to continue employing her because "it was very necessary for [her] to continue at work" and she "need[ed] [her] job." Despite these pleas, Family Health proceeded with its discriminatory termination of Velazquez's employment, thereby depriving her of a vital source of income.

Family Health asserts it terminated Velazquez's employment not out of indifference for her health and safety, but rather to protect her from suffering further work-related injuries. In asking us to accept this farfetched assertion, Family Health ignores that the trial court made an express finding—a finding well supported by the evidence—that its conduct "show[ed] a conscious disregard of the health, safety, and rights of [Velazquez]." It is not our role to "reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589; see *Bankhead v. ArvinMeritor, Inc.* (2012) 205 Cal.App.4th 68, 77 ["[W]e, as an 'appellate court[,] cannot reweigh the credibility of witnesses or resolve conflicts in the evidence.' "].)

Family Health also claims the second reprehensibility factor is not present because it never disregarded the health or safety of persons other than Velazquez. However, the second reprehensibility factor may be present where, as here, the defendant has indifferently or recklessly disregarded the health and safety of the plaintiff alone. (See, e.g., *Roby, supra*, 47 Cal.4th at

20

p. 713; *Colucci v. T-Mobile USA, Inc.* (2020) 48 Cal.App.5th 442, 457 (*Colucci*); *Nickerson v. Stonebridge Life Insurance Co.* (2016) 5 Cal.App.5th 1, 17 (*Nickerson II*); *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 965.) Because the trial court found that Family Health acted in conscious disregard for Velazquez's health, safety, and rights, and Family Health does not challenge the sufficiency of the evidence supporting the court's finding, we conclude the second reprehensibility factor is present.

The third reprehensibility factor is present as well because Velazquez was a financially vulnerable victim. The evidence showed Velazquez remained unemployed for three and a half years after Family Health terminated her employment despite a concerted effort to obtain a new job. There was also evidence indicating Velazquez depleted her savings during this timeframe, became indebted, and was homeless for a period of time.

Regarding the fourth reprehensibility factor, there was "scant evidence [Family Health engaged in] repeated misconduct of the sort that injured" Velazquez. (*State Farm, supra*, 538 U.S. at p. 423.) Velazquez introduced some evidence showing that over a span of several years a handful of Family Health's approximately 1,500 employees filed lawsuits or administrative complaints alleging Family Health engaged in discriminatory conduct against the complainants. Nevertheless, Velazquez's evidence disclosed virtually no information pertinent to the complainants' allegations or the veracity of the complaints. On this record, we cannot conclude Family Health engaged in repeated acts of misconduct of the sort that harmed Velazquez.

Velazquez notes that Family Health did not adopt written policies pertaining to its interactive process, which *threatened* harm to other employees. She also argues there was evidence high-level Family Health employees participated in, or were aware of, the termination of her

21

employment. Even if true, these issues are inapposite to the fourth reprehensibility factor, which "considers whether the tortfeasor was recidivist, i.e., whether its conduct involved repeated actions or was an isolated incident." (*Nickerson II, supra*, 5 Cal.App.5th at p. 19.) Because Velazquez did not establish that Family Health engaged in repeat acts of misconduct, we conclude the fourth reprehensibility factor is absent.

The fifth reprehensibility factor "is of little value in assessing a California punitive damages award because 'accidentally harmful conduct cannot provide the basis for punitive damages under our law.' " (*King v. U.S. Bank National Assn.* (2020) 53 Cal.App.5th 675, 729.) Nonetheless, we note that the trial court made findings and observations concerning Family Health's mental state that cut both ways.

On the one hand, the court found, and we agree, that many of Family Health's actions appeared to be the product of "neglect as opposed to intentional malice, such as [Family Health's] failure to provide [Velazquez] with a proper mouse." Indeed, there is no suggestion in the JNOV order, the parties' briefs, or any portion of the appellate record of which we are aware suggesting Family Health deliberately shirked its duties to accommodate and engage in the interactive process. Rather, Family Health incorrectly believed it satisfied its legal obligations merely by providing Velazquez a defective roller mouse and searching online for substitute employment positions for her. On the other hand, the court noted there was evidence of deceit when Family Health filled out employment separation forms falsely stating Velazquez resigned—thus obscuring the real reason why her employment was terminated. The totality of Family Health's conduct suggests the fifth reprehensibility factor is present but only to a minor degree.

In sum, some reprehensibility factors are present, while others are absent or present only to a small extent. On balance, we agree with the trial court's assessment that Family Health's conduct was moderately reprehensible.

*ii*

*Disparity Between Compensatory Damages and Punitive Damages*

The second guidepost governing the constitutionality of a punitive damages award is "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." (*State Farm, supra*, 538 U.S. at p. 418, citing *Gore, supra*, 517 U.S. at p. 575.)

The U.S. Supreme Court has refrained from "identify[ing] concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." (*State Farm, supra*, 538 U.S. at p. 424; see *Gore, supra*, 517 U.S. at p. 582 ["we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award"].) Nonetheless, it has "establish[ed] a type of presumption: ratios between the punitive damages award and the plaintiff's actual or potential compensatory damages significantly greater than 9 or 10 to 1 are suspect and, absent special justification … cannot survive appellate scrutiny under the due process clause." (*Simon, supra*, 35 Cal.4th at p. 1182.)

"Multipliers *less* than nine or 10 are not, however, presumptively *valid*" under the due process clause. (*Simon, supra*, 35 Cal.4th at p. 1182.) "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." (*State Farm, supra*, 538 U.S. at p. 426; see *Bridgeport Music, Inc. v. Justin Combs Pub.* (6th Cir. 2007) 507 F.3d 470, 487 ["a ratio in

23

the range of 1:1 to 2:1 is all that due process will allow" when only one reprehensibility factor is present and there is already a substantial compensatory damages award].) A lesser ratio may also be warranted where the compensatory damages award appears to contain a punitive element—for example, a substantial award of emotional distress damages. (*State Farm*, at p. 426; accord *Simon*, at p. 1189.) Ultimately, the precise amount of an award "must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." (*State Farm*, at p. 425.)

Here, the jury awarded Velazquez $915,645 in compensatory damages consisting of $165,645 for economic losses and $750,000 for noneconomic losses including pain and suffering. In our view, there can be no reasonable dispute the compensatory damages award was substantial, or as the trial court put it, "quite a handsome recovery." Further, it is apparent the compensatory damages contain a punitive element. While the record supports a finding that Velazquez suffered noneconomic losses, the sheer amount of the damages that were awarded for noneconomic losses—$750,000, or 4.5 times the amount of Velazquez's total economic losses—shows the compensatory damages award is to some extent duplicative of the punitive damages award. These factors warrant a lower ratio of punitive to compensatory damages.

Family Health contends the maximum permissible ratio is 1:1 and, therefore, the trial court erred in reducing the punitive damages award only down to a 2:1 ratio. We disagree. Certainly, a 1:1 ratio of punitive to compensatory damages can in some cases—or perhaps in many cases where the compensatory damages award is substantial—be the constitutional maximum. (See, e.g., *Roby, supra*, 47 Cal.4th at pp. 718–720; *Johnson v. Monsanto Co.* (2020) 52 Cal.App.5th 434, 462.) However, "there is no fixed

24

formula that requires a court to set punitive damages equal to compensatory damages" whenever compensatory damages are substantial. (*Johnson*, at p. 462; see *Bullock v. Philip Morris USA, Inc.* (2011) 198 Cal.App.4th 543, 549 (*Bullock*) ["we do not regard the amount of compensatory damages as a fixed upper limit where damages are 'substantial' "].) Because multiple reprehensibility factors are present in this case, we believe the circumstances dictate a constitutional maximum exceeding a 1:1 ratio. (See *Colucci, supra*, 48 Cal.App.5th at pp. 459–460 [1.5-to-one ratio was the constitutional maximum where the compensatory damages award was substantial and defendant's conduct had a "low to moderate degree of reprehensibility"].)

Velazquez also disputes the trial court's determination that the maximum constitutionally-permissible ratio is 2:1, but unlike Family Health she argues a larger ratio—5:1, or at minimum 4:1 or 3:1—is the correct ratio. She asserts Family Health was in excellent financial condition and, given Family Health's wealth, a larger ratio is necessary to vindicate the state's interest in punishment and deterrence.

"Because a court reviewing the jury's award for due process compliance may consider what level of punishment is necessary to vindicate the state's legitimate interests in deterring conduct harmful to state residents, the defendant's financial condition [is] a legitimate consideration in setting punitive damages." (*Simon, supra*, 35 Cal.4th at p. 1185.) " '[O]bviously, the function of deterrence ... will not be served if the wealth of the defendant allows him to absorb the award with little or no discomfort.' " (*Ibid.*; see *Bullock, supra*, 198 Cal.App.4th at p. 570 [the state's "interests are not served if the amount awarded is so small in relation to the defendant's wealth as to constitute only a nuisance or a routine cost of doing business"].) "On the other hand, 'the purpose of punitive damages is not served by

financially destroying a defendant.' " (*Simon*, at p. 1185; see *Grassilli v. Barr* (2006) 142 Cal.App.4th 1260, 1290 ["A punitive damages 'award should not be so high as to result in the financial ruin of the defendant.' "].)

According to Family Health's financial statements, Family Health had a net worth of approximately $213 million at the end of fiscal year 2017–2018. Accepting for purposes of this appeal Velazquez's assessment that this figure represented Family Health's financial condition, we conclude the trial court's decreased punitive damages award vindicates the state's interests. The punitive damages award, even as reduced by the trial court, was still $1,831,290—quite a large figure. This cannot be characterized as a mere cost of doing business, especially given Family Health's status as a non-profit organization and the substantial amounts Family Health was ordered to pay in compensatory damages ($915,645) and attorney fees costs (approximately $1.1 million). (See *Walker v. Farmers Insurance Exchange* (2007) 153 Cal.App.4th 965, 974 ["Paying $1.5 million over and above the nearly $1.7 million in compensatory damages and attorney fees cannot, as respondent[ ] contend[s], be put down 'simply [as] just another cost of doing business.' "].) Further, the state's interests in punishment and deterrence are lesser here than they might otherwise have been if Family Health had engaged in exceptionally reprehensible or recalcitrant behavior—which, as previously discussed, it did not. (See *Simon, supra*, 35 Cal.4th at p. 1187.)

Given the sizable compensatory damages award as well as the state's relatively diminished interests in punishment and deterrence, we conclude

Family Health's financial condition does not warrant a punitive damages award exceeding a 2:1 ratio of punitive to compensatory damages.[5]

*iii*

*Comparable Civil Penalties*

The final guidepost requires a comparison of the punitive damages award and civil penalties authorized or imposed in comparable cases. (*State Farm, supra*, 538 U.S. at p. 428.) Neither party draws our attention to any civil penalties authorized or imposed in comparable cases. Therefore, "we do not consider this guidepost in 'the calculus of the constitutional maximum of punitive damages.'" (*Nickerson II, supra*, 5 Cal.App.5th at p. 23; see *Tilkey, supra*, 56 Cal.App.5th at p. 559 [considering only first two guideposts where parties agreed there were no corresponding civil penalties].)

*iv*

*Conclusion*

Family Health engaged in misconduct that can be characterized as somewhat or moderately reprehensible. It caused physical harm to a financially vulnerable victim in a foreseeable manner. On the other hand, it was not recalcitrant in its misconduct and much of its behavior appears to have been the product of mere neglect or accident. Further, the jury awarded Velazquez a substantial compensatory damages award that appears to contain a punitive element. Given all these factors, we conclude the trial court did not err in determining the constitutional maximum ratio for a

---

[5] Family Health contends Velazquez exaggerates its financial condition and claims a portion of its alleged net worth was earmarked for various upcoming projects. We need not address this contention because, even accepting Velazquez's assessment of Family Health's financial condition, we conclude the punitive damages award imposed by the trial court vindicates the state's goals of punishment and deterrence.

punitive damages award was twice the amount of the compensatory damages award and therefore reducing the punitive damages award to $1,831,290.

## IV

## DISPOSITION

The judgment and the order granting partial JNOV are affirmed. The parties shall bear their own costs on appeal.


McCONNELL, P. J.

WE CONCUR:


BENKE, J.


IRION, J.

28